976 So.2d 109 (2008)
STATE of Louisiana
v.
Derrick Todd LEE.
No. 2005-KA-2098.
Supreme Court of Louisiana.
January 16, 2008.
Rehearing Denied March 7, 2008.
*115 Capital Appeals Project, Jelpi Pierre Picou, Jr., Marcia Adele Widder, for Appellant.
Charles C. Foti, Jr., Attorney General, Douglas P. Moreau, District Attorney, John Warren Sinquefield, Monisa L. Thompson, Dana J. Cummings, Assistant District Attorneys, for Appellee.
KNOLL, Justice.
On June 25, 2003, an East Baton Rouge Parish grand jury indicted defendant, Derrick Todd Lee, with the May 31, 2002, first-degree murder of Charlotte Murray Pace, a violation of LA.REV.STAT. ANN. § 14:30. Defendant's jury trial commenced on September 13, 2004, and the presentation of evidence ended on October 12, 2004. After hearing closing arguments at the conclusion of the guilt phase, receiving the trial court's instructions, and deliberating defendant's guilt, the jury returned a unanimous verdict of guilty of first-degree murder. At the conclusion of the penalty phase, the jury unanimously returned a verdict of death, finding the defendant committed the aggravated rape of the victim. The trial court sentenced defendant to death in accordance with the jury verdict and denied defendant's motion for new trial on December 10, 2004.
This is a direct appeal under LA. CONST. ANN. art. V, § 5(D) by the defendant, Derrick Todd Lee. Defendant appeals his conviction and sentence raising 32 assignments of error. We will address the most significant of these errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, for the following reasons we affirm defendant's first-degree murder conviction and the imposition of the death sentence.

FACTS
The victim, Charlotte Murray Pace, was a pretty 22 year old who had just graduated from Louisiana State University (LSU) as one of the youngest recipients of a MBA degree. Her family and friends called her Murray. After graduating from LSU, she continued her graduate work with the LSU Alumni Association until her job in Atlanta at the firm of Deloit and Touche would begin later that summer.
On Friday, May 31, 2002, after leaving her graduate work, Pace washed her newly acquired 1999 BMW at approximately 11:52 a.m.[1] and then went to her Baton Rouge townhouse at 1211 Sharlo that she shared with Rebecca Yeager, a close friend for six years, to await Rebecca's scheduled 1 p.m. arrival. Pace and Rebecca planned to travel to Alexandria, Louisiana to attend the weekend wedding of Grace Crouch, a former roommate. When Rebecca arrived *116 at 2:00 p.m., she found Pace's almost completely nude body lying on the floor between the bedroom door and the bed. She observed blood all over the room, on the furniture, and all over the floor; the bed was made, but the bedspread was blood-soaked. She later also found blood in the kitchen and in the hallway to the bedroom. She saw Pace had many small holes in her chest and stomach, and Pace's throat was cut open. Unable to find the townhouse's portable phone, Rebecca used her cell phone to call a 9-1-1 operator and then flagged down a passing police car.
In addition to the Baton Rouge City Crime Scene Unit, the Baton Rouge police, including Detectives Ike Vavasseur, Don Greene and Chris Johnson, called the Louisiana State Police Crime Lab (Crime Lab) to collect trace evidence[2] and to conduct serological techniques prior to moving Murray's body from the crime scene. The Crime Lab sent Julia D. Naylor, an expert in the field of forensic DNA analysis, to examine the crime scene. Her partner, Adam Becnel, accompanied her to the crime scene. Joining Naylor and Becnel at the crime scene were the East Baton Rouge Parish Coroner, Dr. Louis Cataldie, two members of the Coroner's office, Jason Doyle and Don Moreau, and three Baton Rouge crime scene technicians, David Fauntleroy, Darryl Busbin, and Charles Thompson. The police investigators found no evidence of a forced entry into the townhouse.
With the assistance of the crime scene investigators, Naylor took swabs from Pace's breasts and nipples, swabs from voided areas near the rib cage, a swab from her left buttock just below her vagina, and another swab on the decedent's left thigh. These samples were deemed important because a procedure referred to as "ALS" (Alternate Light Source)[3] revealed the presence of biological stains, e.g., urine, feces, saliva, or semen, that might yield valuable DNA evidence. In addition to this evidence, Fauntleroy, one of the crime scene technicians, found a clothing iron in the bedroom and four pieces of plastic, two black and two blue; the iron was in close proximity to Pace's body.[4] The base of the iron (the heating element) was blood-stained and the majority of the iron, including the handle and the cord, was missing. After the investigative team gathered the individual pieces of evidence and labeled each according to protocol, they submitted the specimens to the Baton Rouge City Police who logged them into evidence and sent them to the Crime Lab for scientific analysis.
After the crime scene was searched, the evidence secured, and bags were placed over Pace's hands, the Coroner's Office moved Pace's body to the morgue. At the morgue, Dr. Michael Cramer collected sexual assault kit evidence, taking swabbings from the vaginal and anal areas, as well as the breasts, and submitted the kit for scientific examination. Additionally, Dr. *117 Cramer removed the bags from Pace's hands and took fingernail clippings for future scientific analysis. Pace's tank top and bra, which were found loosened and pulled above her breasts, were also removed. After this evidence was bagged and labeled, Dr. Cramer presented the items to Pamela Faye Young, a Baton Rouge City police officer who works in the crime scene division. Officer Young logged the evidence into the evidence log book at the police office and secured the evidence. This additional evidence was then also sent to the Louisiana State Police Crime Lab for scientific analysis.
Dr. Cramer's autopsy report enumerated 81 different wounds to Pace's body and opined that the cause of death was exsanguination. He theorized that two patterns of stab wounds were present: one resembling lesions caused by a flat bladed screwdriver and the other resembling incised wounds from a knife. He also found Pace sustained blunt injuries to the head with a fractured skull and blunt trauma to the eyeballs, together with multiple bruises to the upper and lower extremities. The heart, the liver and the lungs were perforated three times each; there was also a stab wound to the left area of the eyeball that penetrated into the cranial cavity after fracturing the left frontal bone. In addition, there was an impressive wound at the top of the neck with transection of the cartilage and the esophagus accompanied with a severed left jugular vein.
Dr. Alfredo Suarez, an expert pathologist who reviewed Dr. Cramer's autopsy report and the accompanying photographs,[5] told the jury there were a number of defensive wounds on Pace's arms, forearms, hands and wrists inflicted as she attempted to ward off her assailant. He agreed with Dr. Cramer's opinion that Pace died as the result of exsanguination.
On June 13, 2002, Naylor began her DNA analysis of the evidence she obtained from the crime scene and the fingernail clippings obtained during the autopsy. Although Naylor detected seminal fluid on the swabs from Pace's left buttock and the vaginal and cervical areas, she obtained her most complete DNA profile from the sample taken from the victim's left buttock. Naylor calculated the probability of a random match to the genetic profile of Pace's assailant was 1 in 3.6 quadrillion persons. Naylor recorded the result of her tests in the various DNA data banks maintained at the local, state, and national levels, but she failed to identify a consistent profile with any DNA profile already logged into the systems. Pace's rape and murder remained unsolved during this time.
At the time of Pace's rape and murder, there were other unsolved violent rapes and murders of women in the Baton Rouge and Lafayette areas that caused the police to further investigate these homicides. Indeed, some time later when the DNA analysts in the State Police Crime Lab compared notes on DNA samples recovered from several victims of these unsolved homicides, it showed that a single perpetrator had committed the unsolved homicides of these women. The perpetrator was thus deemed a serial killer. Because some of these homicides were used at defendant's trial to show identity, motive, plan, system, and intent, we will now set forth the facts of five of these homicides the State used at defendant's trial.
On September 24, 2001, eight months prior to Pace's death, Gina Wilson Green, an attractive, successful registered nurse 40 years of age, was found strangled and *118 raped just three doors away from Murray's townhouse. No signs of forced entry were evident. John Colter, the lead detective from the East Baton Rouge Parish Sheriff's Office, opined that although Green's body was found in her bed, a struggle appeared to have begun in the hallway. He said that in the hallway there were large stains, later determined to be fecal matter, a clump of hair, and Green's earrings were separated a good distance on the floor; her shoes were found in different rooms. Crime scene personnel bagged the blouse Green was wearing, logged it into evidence, and submitted it to the Crime Lab for analysis.
Green's shorts, as well as her purse and cell phone, were missing. Through the assistance of Cingular Wireless, Green's cell phone provider, police officers recovered these items dumped behind a warehouse on Choctaw Street in Baton Rouge. In addition to those items, the police recovered a kitchen towel that appeared to come from Green's home.
In April 2002, Angela Ross, an expert in DNA analysis with the Crime Lab, obtained a complete DNA profile from a spot of blood recovered from the back elbow of Green's blouse. Consistent DNA profiles with that found on Green's blouse were also found on the kitchen towel and her blue jean shorts. Ross described the match probability on the blouse as 1 in 3.6 quadrillion. As Ross stated, "Currently the Earth's population is approximately 7 billion . . . and if . . . you would actually have to take over 500,000 Earth populations to have the chance of finding an individual that has the same exact combination of numbers at those locations." Trial Tr. vol. XXXV, 8641 (Oct. 8, 2004).
Approximately five weeks after Pace's murder, on July 8, 2002, Angela Ross and Julia Naylor, the two DNA analysts with the Crime Lab who had independently obtained DNA profiles in the Green and Pace murders, compared the DNA results in their respective cases. Immediately, it became apparent to them that the results from the DNA samples they independently examined in their respective cases indicated that a single perpetrator committed those homicides.
On July 9, 2002, Diane Alexander, an attractive nurse, was attacked at her home in Breaux Bridge, about 45 minutes west of Baton Rouge, in rural St. Martin Parish. On the morning of July 9, Alexander was getting ready for work when a black man, who identified himself as Anthony, knocked on her locked front door, asking for directions to the Montgomerys's. When Alexander said she did not know the Montgomerys, the man asked to use the telephone. He then asked her if her husband might know the Montgomerys. When she eventually informed him that her husband was not at home, the stranger's demeanor quickly changed. He forced his way into the mobile home and overpowered her. The intruder caught her by the throat, told her not to try anything because he was armed with a knife and that he would poke her in the eye. He then attempted to rape her, but he could not maintain an erection. He then bludgeoned her and attempted to strangle her with a telephone cord he cut from the home computer that was close at hand.
Alexander placed her hand between the telephone cord and her neck in an effort to stop her strangulation. She was passing in and out of consciousness when fortuitously her son, Herman, arrived at the residence. When the intruder heard Herman's car approach on the gravel driveway, the attacker ran out the backdoor. Herman saw the unfamiliar car at his parents's home. He described it as a gold Mitsubishi Eclipse with a "Hampton Has It" plate on the front and further noted it *119 had a dent in the hood. He also observed a beige telephone cord hanging out of the car window.
When he entered the home, Herman found his mother on the floor, lying in a pool of blood. Alexander had a skull fracture and she was rushed via helicopter to a Lafayette hospital where she remained for five days. Crime scene personnel from St. Martin Parish secured evidence from the scene of the attack. Two significant items were preserved and logged into evidence for future forensic analysis: the severed end of the telephone cord that was cut from the computer and Alexander's dress with DNA evidence on it.
On July 15, 2002, Alexander gave a detailed description of her attacker to Detective Arthur Boyd of the St. Martin Parish Sheriff's Office. Through her description, a composite sketch of the attacker was made. The evidence from this crime scene and the sketch, which bore a striking resemblance to the defendant, would later become vital in resolving who the perpetrator was in the unsolved homicides of the women in the Baton Rouge and Lafayette areas. Despite the existence of this sketch, at this time the investigation leads were focused on an unknown white male driving a white pickup truck.
Just three days after Alexander's attack, Pamela Piglia Kinamore, a beautiful 44-year-old antique shop owner, was reported missing from her Baton Rouge home. On July 12, 2002, Kinamore's husband, Byron, arrived at their home in Briarwood Place at about 11:45 p.m. He found a full bathtub, spots of blood on a bedroom rug, and a minor dishelving of the bedroom furniture. His wife Pam was not at home.
Three days later, on July 16, 2002, a survey crew found a body just south of the Whiskey Bay exit on Interstate 10. Crime scene investigators also found a piece of telephone cord a few hundred feet from the body; later, forensic analysis would match this piece of cord to that cut from the home of Diane Alexander three days earlier. The body, which had been exposed to three days of summer heat, was initially unidentifiable. Only though the use of dental records was the body identified as being that of Pamela Piglia Kinamore.
An autopsy revealed that Kinamore had been strangled and three significant cut wounds, five and a-half, five, and four inches long, were evident in the neck. These neck wounds cut through the skin, the windpipe, below the larynx and the opening of the airway, and opened the right carotid artery and both jugular veins. A sexual assault kit was also utilized because there was physical evidence of forceful penetration of the vagina and the anus. Defensive injuries were seen on Kinamore's left hand, the right hand, the left elbow, the back of the forearm, the back of the arm, and the knees.
Vaginal swabbings were obtained during the autopsy and turned over to the Crime Lab for forensic analysis. Through scientific testing a DNA profile was procured. Although the profile did not produce a complete set of markers because of the body degradation, it was sufficiently extensive to genetically identify Kinamore's attacker as the same person who murdered Green and Pace.
Thereafter, police officials realized they were looking for the same perpetrator in multiple murders and a Multi-Agency Homicide Task Force was formed in August 2002 to track down the killer.
On November 21, 2002, Trineisha Dene Colomb, an attractive 23-year-old woman, disappeared from her Lafayette home. Her car, purse, and keys were found in Grand Coteau near the cemetery where her mother had been buried approximately *120 seven months earlier. Three days later a hunter found Colomb's body in the woods near Scott, Louisiana. She was wearing only a T-shirt, bra, socks and tennis shoes. Investigators found a pair of fleece pants and a pair of underwear in underbrush near the body. A pool of blood about 30-feet from the body was found and there was evidence the body was dragged through mud to where it was found by the hunter. A forensic pathologist determined Colomb died of blunt force trauma to the head. During the autopsy, the pathologist also obtained a sexual assault kit, took swabbings, and submitted the kit for forensic investigation. Carolyn Booker, a DNA analyst with the Acadiana Crime Lab, visualized semen on the vaginal swabbings and obtained a DNA profile. The profile was consistent with the DNA profile generated in the Green, Pace, and Kinamore murders.
Lastly, on March 3, 2003, Lee Ellis Stanton reported his girl friend, Carrie Yoder, a beautiful 26-year-old graduate student at LSU, disappeared from her home near campus. Stanton reported that he entered the residence through an unlocked window; after entering the residence, he discovered the front door unlocked. Other than a key holder that was askew, a broken necklace, and a small amount of blood on Yoder's purse, there was no indication of a struggle at Yoder's residence.
After days of searching, a commercial fisherman found Yoder's body on March 13, 2003, partially submerged at Whiskey Bay not far from where Kinamore's body had been found. Upon forensic examination and a complete autopsy, it was determined Yoder was raped, strangled, beaten, and stomped. A sexual assault kit was utilized during the autopsy and a complete DNA profile was obtained from the vaginal washings.[6] Natasha Poe, the DNA analyst who examined the evidence obtained from Yoder's sexual assault kit, opined the probability of a random match to the genetic profile of Yoder's assailant was 1 in 3.6 quadrillion persons. The DNA profile Poe identified was consistent with the DNA profiles obtained in the Green, Pace, Kinamore, and Colomb murders. At trial, evidence was presented that showed defendant used a prepaid cell phone on March 3, 2003, three times at approximately 10 p.m. at locations within less than ten miles of Whiskey Bay, the place where Yoder's body was found.
Although the forensic evidence pointed to a single killer, the police had no match of this DNA profile to any that was electronically filed in the data bases maintained on either local, state, or national levels. Accordingly, the Task Force continued its investigation, followed leads turned in, and obtained hundreds of voluntary DNA swabbings.
During this time, on May 5, 2003, independent of the Task Force, the Zachary Police Department and the Louisiana Attorney General's Office,[7] working in concert on the unsolved 1992 murder of Connie Warner and the disappearance of Randi Mebruer on April 27, 1999, obtained a subpoena duces tecum to obtain DNA buccal swabbings from defendant. Pursuant to that subpoena, the police and investigators located defendant at his home, obtained two buccal DNA swabbings, *121 and logged in this evidence at the Zachary Police Department. On the next day, May 6, 2003, the Zachary Police delivered defendant's buccal swabbings to the Crime Lab. On May 20, 2003, Natasha Poe was assigned to test defendant's buccal swabbings and began her testing.
In the meantime, the Task Force expanded its search beyond looking for a white male in a white pickup truck because a Florida forensic lab had determined from several rare markers in the DNA that might suggest the suspect was African-American. Accordingly, on May 22, 2003, Diane Alexander again met with Detective Boyd of the St. Martin Parish Sheriff's Office, reviewed the sketch that was first produced from her description of her black assailant, and modified it only to adjust the hairline to show a razor edge. For the first time, the Task Force joined the St. Martin Parish Sheriff's Office to broadcast Alexander's modified sketch and her son Herman's description of the attacker's fleeing vehicle through television and print media on May 23, 2003. As detailed more fully herein, the Task Force began receiving calls almost immediately after publication of Alexander's composite drawing and the car description. All of the callers identified defendant as the assailant portrayed in Alexander's composite drawing.
Just afterwards, on May 25, 2003, Natasha Poe completed her analysis of the buccal swabs submitted by the Zachary Police Department. Poe's analysis identified defendant as the individual whose DNA profile was consistent with the DNA profile identified in the murders of Gina Wilson Green, Charlotte Murray Pace, Pamela Piglia Kinamore, Trineisha Dene Colomb, and Carrie Yoder. At that time, police authorities were notified, but the decision was made to withhold defendant's name from the public.
Before defendant's identity was publicized, the Task Force emailed a photographic lineup of six individuals to Alexander; one of the photographs depicted defendant. Immediately, Alexander picked out defendant as her assailant, signed her name underneath the individual photograph she identified, and emailed her response to the Task Force.
Even though the Task Force was initially unable to locate defendant at his St. Francisville home, on May 26, 2003, it chose to release defendant's identification as the serial killer. On May 27, 2003, Chris J. Johnson, an East Baton Rouge Parish homicide detective, assisted by the FBI, the U.S. Marshals Service, and the Atlanta Police Department, arrested defendant in Atlanta, Georgia. Defendant did not contest his extradition to Louisiana.
After defendant's arrest and pursuant to a court order, blood was drawn from defendant for further DNA testing. The Louisiana State Police Crime Lab analyzed the blood drawn from defendant and determined that the likelihood of randomly finding another individual other than defendant having the same genetic profile was 1 in 3.6 quadrillion.
On March 31, 2004, the district court ruled the murders of Gina Wilson Green, Pamela Piglia Kinamore, Trineisha Dene Colomb, and Carrie Yoder, as well as the attempted rape and murder of Diane Alexander, were admissible other crimes evidence for the limited purpose of proving identity, motive, plan, system, and intent. This matter then proceeded to trial by jury. As noted above, an unanimous jury found defendant guilty of the first-degree murder of Charlotte Murray Pace and determined the defendant should be sentenced to death.

*122 ASSIGNMENTS OF ERROR
Motion to Suppress DNA
Defendant contends the trial court erred when it denied his motion to suppress DNA evidence collected on May 5, 2003, by the Zachary Police Department and the Louisiana Attorney General's Office. Defendant's argument is threefold: (1) he did not consent to have his cheeks swabbed for a DNA sample; (2) there was no legal and constitutional basis for the use of an Attorney General's subpoena duces tecum issued under LA.CODE CRIM. PROC. ANN. art. 66 without probable cause and not in conformity with the requirements of a search warrant; and (3) the inevitable discovery doctrine was inapplicable to the facts in this case.
The Louisiana and Federal constitutions prohibit unreasonable searches and seizures. U.S. CONSTITUTION ANN. art. IV; LA. CONST. ANN. art. I, § 5. A search warrant may issue only upon probable cause established to the satisfaction of a magistrate, by the affidavit of a credible person, particularly describing the person or place to be searched and the things to be seized. LA. CONST. ANN. art. I, § 5; LA.CODE CRIM. PROC. ANN. art. 162. Probable cause sufficient to issue a search warrant "exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280, 1283 (La.1982); LA CODE CRIM. PROC. ANN. art. 162. The task for a reviewing court is simply to insure that under the totality of the circumstances the magistrate had a "substantial basis" for concluding probable cause existed. Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). Determination of probable cause does not rest on the officer's subjective beliefs or attitudes, but turns on a completely objective evaluation of all the circumstances known to the officer at the time of his challenged action. State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879, 880. A warrantless search is per se unreasonable unless it falls within certain limited, well-delineated exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Hernandez, 410 So.2d 1381 (La.1982); State v. Zito, 406 So.2d 167 (La.1981). Warrants therefore are generally required to search an individual's home or person, "unless `the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." State v. White, 399 So.2d 172, 175 (La.1981). The trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. State v. Vessell, 450 So.2d 938, 943 (La.1984).
In Schmerber v. California, 384 U.S. 757, 761-64, 86 S.Ct. 1826, 1830-32, 16 L.Ed.2d 908 (1966), the Supreme Court assumed that a search warrant resting on probable cause issued by a neutral magistrate would be required for all body-invasion searches; in that case a blood sample was used to determine blood-alcohol content. Id., 384 U.S. at 770, 86 S.Ct. at 1835 ("Search warrants are ordinarily required for dwellings and, absent an emergency, no less could be required where intrusions into the human body are concerned."); compare Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (drug and alcohol testing of railroad employees constituted a "search" where it involved breath and urine analysis); Cupp v. Murphy, *123 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (involuntary collection of fingernail scrapings a search); Winston v. Lee, 470 U.S. 753, 760-61, 105 S.Ct. 1611, 1616-17, 84 L.Ed.2d 662 (1985) (order to compel surgical operation to remove a bullet constituted a search); California v. Trombetta, 467 U.S. 479, 481, 104 S.Ct. 2528, 2530, 81 L.Ed.2d 413 (1984) (breath test a search); Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (induced vomiting violation of due process); with United States v. Dionisio, 410 U.S. 1, 8, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (production of voice exemplar not a search); U.S. v. Mara, 410 U.S. 19, 21-22, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (mandated production of handwriting exemplar not a search); Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (collection of fingerprints not a search); In re Shabazz, 200 F.Supp.2d 578, 581 (D.S.C.2002) (grand jury sought saliva sample after reasonable suspicion established, collection not a search where it was used in a grand jury setting to establish probable cause for later arrest).
The issue of DNA collection through a LA.CODE CRIM. PROC. ANN. art. 66 Attorney General/District Attorney's investigatory subpoena duces tecum is res nova to this Court. Accordingly, we find it appropriate to look at the decisions of other courts to examine their characterization of the collection of DNA in terms of the requirement for a search warrant.
According to the United States Fifth Circuit, "[i]t is undisputed that the collection of a saliva sample for DNA analysis is a search [requiring a warrant] implicating the Fourth Amendment." Kohler v. Englade, 470 F.3d 1104, 1109 (5th Cir.2006); see also, Padgett v. Donald, 401 F.3d 1273, 1277 (11th Cir.2005) ("The Commissioner does not dispute that the statutorily required extraction of saliva for DNA profiling constitutes a `search' within the meaning of the [Fourth] Amendment."); Groceman v. U.S. Dep't of Justice, 354 F.3d 411, 413 (5th Cir.2004) ("The extraction of blood from a prisoner to collect a DNA sample implicates Fourth Amendment rights."); Schlicher v.(NFN) Peters, I & I, 103 F.3d 940, 942-43 (10th Cir. 1996) ("It is agreed that the collection, analysis and storage of blood and saliva . . . is a search and seizure within the meaning of the Fourth Amendment."); In Re Grand Jury Proceeding, 455 F.Supp.2d 1281, 1282 (D.N.M.2006) (saliva samples may not be compelled by a grand jury on the mere chance that desired evidence might be obtained); but see Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1996) (collection of sex offender inmate's saliva does not violate any expectation of privacy in the information revealed where the inmate has diminished privacy rights and procedure not dissimilar from fingerprinting); State v. Lee, 05-0456 (La. App. 1 Cir. 5/16/07), 964 So.2d 967 (reasonable suspicion sufficient to justify subpoena duces tecum to compel production of buccal swab for DNA sample).[8] When the facts of the present case are compared *124 to the aforementioned jurisprudence of other courts, we find the collection of defendant's DNA constituted a search.
Before addressing the heart of this issue as it pertains to defendant's motion to suppress and as a preliminary matter, we note the State argued to the trial court and again before us that defendant consented to produce DNA samples through the use of buccal swabbings of both cheeks. Thus, the State urges defendant's consent obviated the necessity for a search warrant.
For this argument to be successful, the State will have to hurdle the burden of showing more than acquiescence to a claim of lawful authority. As stated in Bumper v. North Carolina:
When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.
Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).
In the present case, it is clear law enforcement officers from the Attorney General's Office and the Zachary Police Department encountered defendant at his home, advised him they had a court order compelling him to submit to swabbing to obtain his DNA, and showed him a subpoena duces tecum, requiring him to submit a DNA sample instanter. Given these facts, it is clear under Bumper defendant simply acquiesced to the lawful authority of law enforcement and it cannot be said that such acquiescence constituted free and voluntary consent. Therefore, although the trial court never reached the issue of defendant's consent, we find no merit to the State's contention that defendant consented to the buccal swabbings.
The State next asserts a subpoena duces tecum issued by a judge under LA. CODE CRIM. PROC. ANN. art. 66 is the "functional equivalent" of a search warrant that would not violate the protections of the Fourth Amendment.
LA.CODE CRIM. PROC. ANN. art. 66(A) states in relevant part:
Upon written motion of the attorney general or district attorney setting forth reasonable grounds therefor, the court may order the clerk to issue subpoenas directed to the persons named in the motion, ordering them to appear at a time and place designated in the order for questioning by the attorney general or district attorney respectively, concerning any offense under investigation by him. The court may also order the issuance of a subpoena duces tecum.
The basis for the State's argument is that art. 66 subpoenas and search warrants are equivalent because both require review by a neutral magistrate. However, as recognized by the First Circuit in State v. Lee, a subpoena duces tecum does not require probable cause, as a search warrant does. State v. Lee, 05-0456, pp. 8-9, 964 So.2d 967.[9] A subpoena duces tecum *125 can be supported by probable cause, but such a threshold showing is not required. A District Attorney or the Attorney General must instead only establish "reasonable grounds" to support the subpoena, and as with any other subpoena, the issuing party must give "a reasonably accurate description" of what is sought. LA. CODE CRIM. PROC. ANN. art. 66; LA.CODE CRIM. PROC. ANN. art. 732.
In the present case, the State adduced testimony during redirect examination at the pre-trial suppression hearing that the purpose of the subpoena was to gather evidence to obtain probable cause to arrest defendant. For this reason it filed the court order authorizing the subpoena under seal to protect the intended target should the swabbings exclude him as a suspect. Even though the State avers in the present case that a judge reviewed the subpoena request and stated at a pre-trial suppression hearing that he "realized the import of the request," "applied [the] probable cause standard," and "would have signed a search warrant," such treatment exceeded what is statutorily called for in art. 66.
Notwithstanding its post hoc finding of probable cause (after the DNA test led to the arrest of defendant), there is no way to ascertain which standard the judge utilized when presented with the art. 66 request for the issuance of a subpoena duces tecum. Moreover, despite the State's claims of the equivalence of the subpoena to a search warrant, we observe the subpoena in the present case did not include the sworn supporting affidavit a search warrant is required to contain. LA. CONST. ANN. art. I, § 5 ("No warrant shall issue without probable cause supported by oath or affirmation . . ."). As evidenced in his testimony at the motion to suppress, the issuing judge twice acknowledged what he signed was not a search warrant.
Regardless, even assuming a subpoena duces tecum may constitute the functional equivalent of a search warrant in some circumstances, the application at a minimum must rest upon a showing of probable cause, not simply the "reasonable grounds" required by art. 66. Thus the application must contain within its four corners the facts establishing the existence of probable cause. State v. Duncan, 420 So.2d 1105 (La.1982); State v. Wells, 253 La. 925, 221 So.2d 50 (1969). In passing on the validity of a search warrant (or its functional equivalent), a reviewing court may consider only information brought to the magistrate's attention. Aguilar v. Texas, 378 U.S. 108, 109, n. 1, 84 S.Ct. *126 1509, 1511, 12 L.Ed.2d 723. In other words, to be a valid search, the State must have unintentionally obtained a de facto search warrant captioned as an art. 66 subpoena duces tecum. Cf. State v. Clark, 02-1463, p. 36 (La.6/27/03), 851 So.2d 1055, 1081 (court order for production of blood sample equivalent of proper search warrant, notwithstanding its name, when it was "issued with all of the safeguards that a warrant affords" and probable cause found).
Assuming the correctness of the State's argument on this point, we nonetheless find it did not present the trial court sufficient facts to support a finding of probable cause for the lawful issuance of a warrant. In the present case, the State based its request for a subpoena on five factors: (1) defendant had been arrested years before on a "Peeping Tom" charge in the subdivision in which the two victims in Zachary had been abducted and/or murdered; (2) defendant had an extensive criminal record involving arrests, charges, and/or convictions for burglary, attempted burglary, stalking, aggravated battery, trespassing, and "Peeping Tom" charges; (3) both defendant and his girl friend indicated he had occasion to drive past Randi Mebruer's subdivision the night she disappeared; (4) defendant was not incarcerated at the time of the abduction/murders of the two Zachary victims, or of any of the other serial killer's victims; and (5) a friend of defendant informed police that defendant had told him the "police were harassing him" about the disappearance of a Zachary woman just two days after Mebruer's disappearance.
Even when considered under the totality-of-circumstances, we find these factors do not support the conclusion the State established probable cause in its subpoena request. See Gates, 462 U.S. at 229-230, 103 S.Ct. at 2327-28. When viewed from the perspective that this subpoena was sought before it was shown that defendant was conclusively linked by his DNA to the murders, his prior criminal history, his movements within the community, as well as his lack of incarceration at the time of those murders and those of the serial killer were insufficient to provide a reasonable basis to conclude he was involved with the Zachary abductions/murders. See e.g., Kohler v. Englade, 470 F.3d 1104, 1111 (5th Cir.2006) ("While the use of prior arrests and convictions can be helpful in establishing probable cause, especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover," burglary is not a crime of the same general nature as rape or murder)(citing Greenstreet v. County of San Bernardino, 41 F.3d 1306, 1309 (9th Cir. 1994)); Robinson v. Texas, XX-XX-XXXX (Tex.App.-Austin 9/7/06) 2006 WL 2589249 ("Appellant is correct to assert that neither his reputation, his prior criminal record, nor his presence in a high-crime neighborhood gave the officers probable cause to arrest him.").
Furthermore, a confidential informant's unsubstantiated declaration that defendant had mentioned "being harassed by the police about a missing woman" two days after Mebruer's disappearance is insufficient to reasonably suggest he was responsible. This insufficiency is underscored and heightened where there is no background given in the motion for the issuance of the subpoena about the source's credibility or connection to defendant. There is no "corroboration through other sources of information [that would reduce] chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting the hearsay." Gates, 462 U.S. at 244-45, 103 S.Ct. at 2335; State v. Williams, 338 So.2d 1365, 1369 (La.1976) (when affidavit that contained no *127 attestation to reliability of informant, nor disclosed informant's basis for conclusions, it could not support issuance of search warrant). Setting aside the absence of any sworn statements or other indicia of a valid search warrant, the factors listed in the motion for the issuance of the subpoena duces tecum did not rise to the level of probable cause.
Having disposed of these initial issues, we now examine whether the evidence from defendant's buccal swabbing is admissible under the inevitable discovery rule. Defendant claims the State failed to prove by a preponderance of the evidence that it would have inevitably discovered his DNA through other unrelated investigations. To the contrary, the State argues each investigation would have inevitably identified defendant as a viable suspect and further posits that defendant may have already been identified as a suspect at the time of the issuance of the subpoena duces tecum.
One of the theories courts use in addressing "fruit of the poisonous tree" issues is the inevitable discovery rule. The inevitable discovery doctrine "is in reality an extrapolation from the independent source doctrine: Because the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Murray v. United States, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). A functional similarity exists between the independent source and inevitable discovery doctrines because both seek to avoid excluding evidence the police "would have obtained . . . if no misconduct had taken place." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The State therefore bears the burden of proving by a preponderance of the evidence that "the information ultimately or inevitably would have been discovered by lawful means. . . ." Id.; State v. Vigne, 01-2940 (La.6/21/02), 820 So.2d 533, 539. Application of the inevitable discovery doctrine thus "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment. . . ." Nix v. Williams, 467 U.S. at 444, 104 S.Ct. at 2509 n. 5; State v. Vigne, 820 So.2d at 539.
Integral to the proper application of the inevitable discovery doctrine is a finding that law enforcement would have inevitably secured the evidence by lawful means, not simply that they could have. Thus, a mere showing that the police had probable cause for a search and could have secured a warrant from a neutral magistrate does not satisfy the doctrine, because it would effectively obviate the Fourth Amendment preference for warrants and reduce the exclusionary rule to cases in which the police lack probable cause. See United States v. Elder, 466 F.3d 1090, 1091 (7th Cir.2006)("The usual understanding of that doctrine is that the exclusionary rule should not be applied when all the steps required to obtain a valid warrant have been taken before the premature search occurs [citing Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)]. . . . If probable cause alone  without putting in train the process of applying for a warrant  were enough to invoke the inevitable-discovery doctrine, that would have the same effect as limiting the exclusionary rule to searches conducted without probable cause."); see also 6 LaFave, Search and Seizure, § 11.4, at 278-79 (Fourth Ed.) ("Circumstances justifying application of the `inevitable discovery' rule are most likely to be present if these [independent] investigative procedures were already in progress prior to the discovery via illegal means, as in Nix v. Williams, or where the circumstances *128 are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.").
In the case sub judice, the State asserts law enforcement was closing in on defendant, various agencies were pursuing him as a suspect, and more leads which drew attention to defendant were coming in daily. The State further contends it would have inevitably acquired the defendant's DNA either by consent or through "surreptitious" means, e.g., by checking defendant's garbage, searching for cigarette butts, soft drink cans, envelopes, disposable plates and utensils. The State contends that through the "quality and quantity of evidence available to the Serial Killer Task Force, Zachary Police, West Feliciana Parish Sheriff's Department, Attorney General's Office, and St. Martin Parish Sheriff's Office was such that each agency [would eventually have] come to regard defendant as a suspect." State brief at 21.
The record shows two lines of criminal investigation involving defendant were underway prior to the issuance of the subpoena duces tecum on May 5, 2003. The first branch consisted of members of the Zachary Police Department and investigators with the Louisiana Attorney General's Office who were investigating the April 27, 1999, disappearance of Randi Mebruer from her Zachary home, as well as the 1992 murder of Connie Warner. Ray Day, a police officer with the Zachary Police Department, testified he had actively investigated Mebruer's disappearance (her body has never been found) from the very beginning and defendant was the main suspect. Dannie Mixon, an investigator with the Attorney General's Office, stated he too had actively assisted the Zachary Police Department in the disappearance of Mebruer and he viewed defendant as the primary suspect since the end of April 1999. It was because of this continued investigation and the recent information the confidential informant provided that prompted the Attorney General's Office to seek the art. 66 subpoena duces tecum. Neither the Zachary Police Department nor the Louisiana Attorney General's Office were part of the Multi-Agency Homicide Task Force (Task Force) formed in August 2002.
Independent of the Zachary Police Department and the Louisiana Attorney General's Office, the Task Force was conducting its own investigation after DNA profiles were matched in the Green and Pace murders in East Baton Rouge Parish by Angela Ross and Julia Naylor, two forensic DNA analysts with the Crime Lab. David Smith, a detective with the East Baton Rouge Parish Sheriff's Office, testified at the hearing on defendant's motion to suppress that a lead was first called in to the Task Force on September 4, 2002, naming defendant as a suspect in the serial killings. That lead was assigned to a member of the Narcotics Division who "closed" the lead at that time because defendant was neither white nor did he drive a white truck, the two elements then deemed characteristic of the suspected serial killer.
Notwithstanding the earlier "closure" of the lead identifying defendant, the Task Force received a new lead on March 31, 2003, naming defendant as a suspect in the serial killings. At that time, this lead was reopened for two reasons: (1) a sample of the matching DNA evidence acquired in the Green and Pace murders was sent to a Florida lab which determined that several rare markers in the DNA might suggest the suspect was African-American; and (2) while the police canvassed the neighborhood shortly after Carrie Yoder's disappearance on March 3, 2003, the Task Force received reports of a black male *129 being seen around Carrie Yoder's house shortly before her murder.
Testimony was presented at the suppression hearing that the new tip of March 31 was reassigned to an investigator who unsuccessfully attempted to contact defendant once. When the investigator could not locate defendant, he left instructions with the West Feliciana Parish Sheriff's Office to let him know when defendant was seen again. The agent, however, had not yet located defendant before the Attorney General's office collected defendant's DNA on May 5, 2003.
These tips that named defendant as a suspect prior to the May 3 issuance of the subpoena duces tecum, though not conclusive in the analysis of inevitable discovery, are significant when placed into the context of the operations of the Task Force. As the State notes, the evidence showed 26,000 suspects and their corresponding leads were to be investigated and not "closed" until successfully resolved vis-à-vis an alibi that could be established or by the voluntary submission of DNA and the exclusion of that profile when compared against that generated by the State Police Crime Lab. Utilizing that criteria, approximately 18,000 leads had been "closed" at the time of defendant's capture. At the time of the release of the DNA testing that identified the serial killer, the Task Force's new lead on defendant had not yet been closed.
Against that backdrop, Detective David Smith testified that "but for" defendant's arrest, the Task Force investigator would have worked the lead on defendant until it too could have been cleared by alibi or DNA exclusion. The investigator also testified that in the event consent was not given by a suspect for a DNA sample, and an alibi could not be otherwise established, "that entire team would be dedicated to resolving that lead one way or another." Trial Tr. vol. XXI (Oct. 22, 2004). He further stated DNA could also have been collected by the aforementioned surreptitious means with other leads.
Even though this evidence demonstrates "historical facts capable of ready verification or impeachment" as enunciated in Nix, we need not rest our resolution of the inevitable discovery rule on these facts alone. As the chronology of events unfolded, it is important to remember that although defendant's buccal swabbings were obtained on May 3, 2003, Natasha Poe, the analyst in the State Police Crime Lab who examined the swabbings, testified at trial that she did not begin her analysis until May 20 because she was out of town, and did not conclude her testing until May 23, 2003. She then reported her findings immediately to her superior who evidently did not convey them to the Task Force until May 25, 2003.
Two days prior to the release of the Crime Lab's results of the May 3 swabbings of defendant, the investigation leading to the identification of defendant as the South Louisiana Serial Killer by lawful means intensified with the release of Alexander's composite drawing and her son's description of the car he saw in the Alexanders's driveway. Alexander, the only victim that survived the defendant's attack, had provided a detailed description of her July 22, 2002, attacker to the St. Martin's Parish Sheriff's Office and a composite drawing of her attacker was produced. This drawing remained underutilized by the Task Force for nearly a year because the focus of attention was not on an African-American male. After the Task Force's focus broadened, the Task Force met with Alexander on May 22, 2003. At that time, Alexander made a slight adjustment to her original composite with regard to her assailant's hairline. On May 23, 2003, Mary Ann Godwa, the spokesperson *130 for the Task Force, testified that on May 23 she conducted a noon press conference at the Lafayette Parish Sheriff's Office to release the sketch of the assailant to the television and press media. After the press conference and over the course of the next day, the Task Force received four different tips referring to defendant by name and describing his car as a match to the one Alexander's son described. As can be verified from the record, Alexander's sketch of her attacker, given approximately ten months before defendant's buccal swabbing, bore a striking resemblance to the defendant.
The first new tip came on May 23, 2003, the day of the release of the composite drawing, at 2:24 p.m. The caller, as summarized in the Task Force's event narrative, indicated:
Thinks she knows the person because of the description of the car, a gold Mirage. He was a Peeping Tom before. She thinks his name is Todd Lee. He is from St. Francisville. He is always in and out of jail. His wife had a type of car . . . they are describing. Not long ago he was charged with a crime similar to breaking in. Call her if you need more information.
Trial Tr. vol. XXI, 5149 (April 22, 2004).
The second tip was received at about 6:16 p.m. on May 23, 2003. The call narrative to the Task Force was summarized as follows:
Caller works for a local sheriff's office. He knows someone that has a past criminal history for stalking women from the St. Francisville area. His name is Derrick Lee, about 5'10". The suspect made the comment that he had killed a woman he was dating before. The suspect fits the sketch. He's light-complected, black male. He had a small gold car at one time. He keeps himself up really clean, keeps his hair short, thin mustache and he has a muscular build.
Trial Tr. vol. XXI, 5151 (April 22, 2004).
Another email tip was received on May 24, 2003, at 5:41 p.m. That tip was summarized as follows:
The event narrative here was he was looking at the picture of the man on the front page of The Advocate. His name is Derrick Lee and he lives in St. Francisville. He has a history of being a peeping tom and was the prime suspect in a double homicide in Zachary. Randy Metz with the West Feliciana Sheriff's Department can tell you more about the case.
Trial Tr. vol. XXI, 5152 (April 22, 2004).
Again on May 24, 2003, a fourth tip was received. Its summary indicated:
The event narrative here is calling to report a man that fits the description of serial killer. This man has a gold Mirage that is wrecked in the front, and the man that tried to rape a woman in Breaux Bridge had a gold Mirage that was wrecked in the front too. He is the exact same man in today's paper except that his lips need to be a little bit bigger. His name is Derrick Todd Lee and he used to live on Highway 61 right after you pass the truck stop called Southern Belle. The car is parked in front of his mother's house in St. Francisville on Blackmore Road. His whole family lives in that area and he never moved out of the house but just disappeared with wife and kids.
Trial Tr. vol. XXI, 5153 (April 22, 2004).
Although these leads were received on May 24, and May 25 by the Task Force after publication of Alexander's composite sketch and her son's description of the attacker's vehicle, they were unable to be pursued before defendant's arrest a short time later on May 27, 2003.
*131 Considering the historical facts that are verifiable, we find the State satisfied its burden of showing by a preponderance of the evidence there was a parallel and independent investigation unrelated to the illegal search that would have inevitably and legally yielded defendant's DNA. When viewed in light of the Task Force's receipt of four rapid-fire tips identifying defendant by name and make of car after the release of the sketch of the serial killer, it is apparent defendant's apprehension was no longer an object of pure speculation, but rather a matter of imminent reality. The tips various citizens called in provided probable cause to arrest defendant as Alexander's assailant. Through the pursuit of this entirely independent investigation based on information entirely untainted by the prior collection of defendant's DNA sample, it is evident the police would have arrested the defendant and would have secured a DNA sample. Thus, the State has shown: (1) there is a reasonable probability the contested evidence would have been discovered by lawful means in the absence of police misconduct; and (2) law enforcement was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. See e.g., United States v. Lamas, 930 F.2d 1099, 1102 (5th Cir.1991); United States v. Cherry, 759 F.2d 1196, 1205-1206 (5th Cir. 1985); cf. United States v. James, 353 F.3d 606, 616 (8th Cir.2003) (no proof of inevitable discovery given absence of evidence that there was actual, alternative investigation which would have led to discovery of evidence); United States v. Procopio, 88 F.3d 21, 27 (1st Cir.1996) (inevitable discovery exception applicable when local police would have certainly contacted local agents and secured a warrant on their own); United States v. Drosten, 819 F.2d 1067, 1071 (11th Cir.1987) (inevitable discovery exception applicable when evidence indicated police knew witness's telephone number and were actively pursuing evidence of his name through lawful avenue of discovery when illegal search revealing name occurred); Davis v. Georgia, 262 Ga. 578, 583, 422 S.E.2d 546, 551 (1992) (no inevitable discovery found where the State did not show a standard procedure where warrant would have been sought following 10-year-old child's telephone call stating that drugs were in house).
In summation, the collection of defendant's DNA constituted a Fourth Amendment "search" that would require probable cause, a sworn supporting affidavit, and the issuance of a proper search warrant. The State's attempt to file a subpoena duces tecum through the use of LA.CODE CRIM. PROC. ANN. art. 66 was a circumvention of the constitutional mandates for the issuance of a search warrant based upon probable cause. However, due to the sheer size and complexity of the search for the South Louisiana Serial Killer, other agencies working independently of the Attorney General and the Zachary Police Department received specific tips naming defendant as a suspect both before and after the illegal search. Task Force members testified as to their standard procedure used to pursue every lead and exclude every suspect through alibis and/or DNA analysis. Accordingly, it is clear from the record that law enforcement already suspected defendant, and had an established operational procedure to investigate him at the time the DNA from the illegal search was obtained and matched. Law enforcement then acquired probable cause to arrest defendant and secure his DNA to identify him as Diane Alexander's assailant as well as the other murders. Consequently, defendant's DNA would have been inevitably collected and matched to his victims. Thus the trial court properly *132 denied defendant's motion to suppress.
Motion for Change of Venue
Defendant contends the trial court's denial of his motion for change of venue based upon the extraordinary media coverage of this case unfairly deprived him of his right to a fair trial by an impartial jury. Defendant argues this case was extraordinary and the notoriety inherently associated with the search for the South Louisiana serial killer brought into question the issue of whether defendant could receive a fair trial in the Baton Rouge community. Additionally, defendant emphasizes he was tried and convicted just a month before this trial in West Baton Rouge Parish of the second-degree murder of Carolyn Barr Desoto and news coverage of that trial flooded East Baton Rouge Parish. See, n. 8, supra.
On July 17, 2003, defendant filed a motion for change of venue, and supplemented that motion on January 30, February 6, and February 27, 2004. After defendant introduced thousands of print and media stories about the search for the South Louisiana Serial Killer into evidence, the trial court deferred ruling on the motion until after jury selection commenced. Ultimately, on the fourth day of jury selection, the trial court denied defendant's motion for change of venue. As a result of the trial court's deferral of defendant's motion until voir dire examination began, we have the entire record of voir dire examination, approximately nine volumes of the trial transcript involving more than 100 jurors,[10] to examine whether defendant was able to select a fair and impartial jury.
As provided, in pertinent part, in LA. CONST. ANN. art. I, § 16, "Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law." Concurrent with that right, the law provides for a change of venue when a defendant establishes he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Blank, 04-0204 (La.4/11/07), 955 So.2d 90, 140.
LA.CODE CRIM. PROC. ANN. art. 622 governs change of venue which provides:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
In unusual circumstances, prejudice against the defendant may be presumed. See State v. David, 425 So.2d 1241, 1246 (La.1983) ("[U]nfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob."). Otherwise, the defendant bears the burden of showing actual prejudice. State v. Vaccaro, 411 So.2d 415, 423-24 (La.1982); State v. Adams, 394 So.2d 1204, 1207-8 (La.1981); State v. Williams, 385 So.2d 214, 215-217 (La.1980).
*133 A defendant must prove more than mere public general knowledge or familiarity with the facts of the case to have his trial moved to another parish. State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1, 16 (no "bright line test for determining the degree of prejudice existing in the collective mind of the community . . . the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial"). A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime. State v. Clark 02-1463 (La.6/27/03), 851 So.2d 1055; see also State v. Huls, 95-0541 (La.App. 1 Cir. 5/29/96), 676 So.2d 160, 172 (defendant was not entitled to change of venue of murder trial based on pretrial publicity, when thorough voir dire of prospective jurors was conducted, most jurors were questioned individually about their exposure to publicity, and all prospective jurors who could not make unbiased judgment based on their exposure to pretrial publicity and their inability to set aside that information were excused). However, courts must differentiate largely factual publicity from that which is invidious or inflammatory because they present real differences in the potential for prejudice. State v. Clark, 851 So.2d at 1071.
Whether a defendant has made the requisite showing of actual prejudice is "a question addressed to the trial court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." State v. Wilson, 467 So.2d 503, 512 (La. 1985) cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); see also Vaccaro, 411 So.2d at 424. Several factors are pertinent in determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. State v. Bell, 315 So.2d 307, 311 (La. 1975); see also State v. Brown, 496 So.2d 261, 263 (La. 1986). Moreover, the jurisprudence shows courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. Clark, 851 So.2d at 1071.
Nature of pre-trial publicity: In support of defendant's motion for change of venue, he filed into evidence over 5,000 pages of printed media reports and newscast transcripts published between July 2002 and January 2004 that related to the South Louisiana Serial Killer. The record also reveals that 123 of 125 potential jurors stated they were at least vaguely familiar with this case through media accounts or informal private conversations. We further observe the trial court only excused 40 jurors (32%) for cause due to their exposure to publicity or opinions of the case. Additionally, defendant challenged 16 jurors for cause. Accordingly, if defendant had been granted all of these challenges, the total percentage of cause challenges would have been 44%. After examining these statistics and surveying prior jurisprudence, we find these numbers consistent with other similarly situated cases in which venue was not changed. *134 See State v. Weary, 03-3067 (La.4/24/06), 931 So.2d 297, 315 (capital murder defendant not entitled to change of venue based on pretrial publicity; while most of venire had knowledge of case through media sources or through general community knowledge, media coverage was primarily factual in nature, record showed that each prospective juror individually was questioned concerning his or her knowledge of the instant case and opinions concerning defendant's guilt or innocence, and while defendant was black and victim was white, prospective jurors' voir dire responses failed to show any indication that race was an issue that community considered); State v. Frank, 99-0553, 803 So.2d at 16-17 (change of venue not required when 110 out of 113 venire members (97.3%) "had been exposed to some publicity surrounding the case" and 89% of the prospective jurors indicated that they had been exposed to information about the case on more than one occasion or from multiple sources); State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 555 (denial of venue change not abuse of discretion when 72 out of 90 prospective jurors (80%) had awareness of the case before trial and court questioned each prospective juror individually in painstaking detail concerning his or her knowledge of the instant case, and opinions concerning the defendant's guilt or innocence).[11]
*135 It cannot be gainsaid that media coverage was extensive from the time of defendant's arrest through his trial. It is also evident that on August 2, 2004, defendant, as more fully detailed in n. 8, supra, was tried and convicted by a jury in West Baton Rouge Parish for the second-degree murder of Geralyn Barr DeSoto. Although DeSoto's murder was not part of the other crimes evidence used in the State's prosecution against defendant in the Pace homicide, it is true that much of the other crimes evidence in the present prosecution was also used in the West Baton Rouge Parish prosecution. It is equally true the media reported the facts of the West Baton Rouge Parish prosecution. Despite media coverage of a defendant's conviction in another case, such coverage does not constitute prejudice as long as the coverage is solely factual and not inflammatory. See e.g., Snell v. Lockhart, 14 F.3d 1289, 1293 (8th Cir.1994). Defendant has not shown the pre-trial publicity, particularly about his West Baton Rouge Parish conviction, was inflammatory.[12] On the other hand, the record shows time and again during voir in the present case that those jurors who were unable to put pre-trial publicity out of their minds were excused. Likewise, all the jurors who served on defendant's jury not only assured the court they were able to decide the case against defendant in the Pace prosecution based solely upon the evidence presented at trial, but also they would accord the defendant the presumption of innocence. Finally, the record bears out that the trial court repeatedly admonished jurors from viewing media coverage of the case during voir dire and trial.
Comments of governmental officials: Even though voir dire examination showed almost all prospective jurors were exposed to the case or the several serial killer cases, the comments of government officials were not included in many pretrial articles. As detailed in the State's argument to us, few of the statements officials made included comments by the East Baton Rouge Parish District Attorney's Office; those comments that the District Attorney's Office did make involved procedure and the court proceedings. Importantly, many of the statements law enforcement officials made were patently inconsistent, especially as they related to the profile of the South Louisiana serial killer.
Length of time between comment and trial: Defendant was arrested in Atlanta, *136 Georgia on May 27, 2003, and his trial commenced more than a year later on September 13, 2004. It was not until shortly before defendant's arrest that media accounts detailed the DNA evidence and victim's sketches depicting the suspect as an African-American. In fact, although the first homicide that would be linked to the serial killer investigation occurred on September 24, 2001, for the greater part of the serial killer investigation, law enforcement focused on several suspects, including the delusory "white man in a white pickup truck." As a result, defendant was not the subject of media coverage for a prolonged period of time and publicity involving him was not initiated until his identification and arrest.
Severity and notoriety of the offense: Although the severity and notoriety of the Pace murder was extreme, the current murder trial, when compared with other similar first-degree murder convictions, presents facts that are unfortunately not dissimilar from other like first-degree murder convictions this Court has reviewed. See e.g., State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377 (defendant robbed victim over the age of 70 and strangled him with his shoelaces and an electrical cord); State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675 (defendant raped and slashed throat of 12-year-old victim, stomping her face as he left); State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396 (defendant robbed and raped 67-year-old woman in her home, then killed her by repeatedly stabbing her, slashing her throat, and dropping a couch on her face); State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6 (defendant killed a 68-year-old man by repeated stabbing during the course of an armed robbery in the parking lot of a Burger King); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (defendant repeatedly and viciously stabbed two people during a home invasion); State v. Jones, 474 So.2d 919 (La.1985) (defendant kidnapped 11-year-old victim, beat her, raped her, and choked her to death, eventually dumping her body in a drainage canal).
The area from which the jury was drawn: At the time of the 2000 Census, East Baton Rouge Parish had a population of 412,852. See http://quickfacts.census.gov/qfd/states/22/22033.html (accessed September 25, 2007). The jury pool summoned for this case consisted of 1,300 persons and was far larger than average. As mentioned previously, over 98% of jurors polled had heard something of the case, from either media outlets or acquaintances.[13] The record shows jurors who knew any of the parties or witnesses were not allowed to remain. With a venire pool so large, however, this did not cause a dearth of qualified prospective jurors.
Other community events that either affect or reflect the community attitude toward defendant: The majority of jurors candidly admitted they did not significantly change their lifestyle while the search for the serial killer continued. When queried about the impact of the serial killings, jurors for the most part responded they were more aware of their surroundings and were more cautious when conducting their daily lives. Although defendant emphasizes the Task Force received 26,000 tips, he neither quantifies how many came from East Baton Rouge Parish nor shows how these tips demonstrate a community bias specifically against him. Defendant fails to provide any support for his contention that general public participation in a police investigation automatically equates to venire bias.
*137 Factors that likely affect the candor and veracity of prospective jurors: Our review of the record shows the prospective jurors appeared truthful when questioned directly and repeatedly on the issue of defendant's guilt, and the clear majority of jurors with a pre-existing opinion stated they were able to put it aside and base their verdict only upon evidence presented at trial.
In summation, considering that less than one-third of the prospective jurors were excused because of their inability to put aside their pre-trial exposure, defendant fails to demonstrate in the context of the other Bell factors that the undoubtedly high press coverage of the investigation was sufficient to alter the "candor and veracity" of the jurors's answers during voir dire examination. In fact, several jurors expressed their lack of enthusiasm for serving on the jury, despite their willingness to do so if called upon. The ever-changing profile of the serial killer, and the public perception of rampant mistakes in the investigation during the search for the serial killer would work as much in favor of defendant as the publicity would work against him. As we have previously observed, "the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is insufficient to rebut the presumption of the juror's impartiality." State v. Clark, 851 So.2d at 1071. Defendant fails to show the existence of pretrial publicity was such that it would color the jurors' voir dire responses to the point of making them unreliable and that he was therefore deprived of his right to trial by a fair and impartial jury. After carefully reviewing the record of this matter, defendant failed to show the trial court abused its discretion in denying his motion for a change of venue.
Defense funding
Defendant next contends the trial court denied him adequate funds to mount a defense and deprived him of effective assistance of counsel. Specifically, defendant claims the $37,000 he received was far less than the $216,000 needed to secure several necessary experts. With the refusal of more funding, defendant claims he was deprived of the "raw materials integral to the building of an effective defense." Ake v. Oklahoma, 470 U.S. 68, 78, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985). Additionally, defendant argues the trial court erred when it failed to consider the heavy caseloads under which defendant's trial counsel labored.
From the outset, we note that at a hearing on expert funding, whether ex parte or contradictory, defendant has the burden to show a need for the funding by establishing with a reasonable degree of specificity what type of expert is needed and the purpose for which the expert is required. State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213, 1221. He must show it is more likely than not the expert assistance will be required to answer a serious issue or question raised by the State's or defense's theory of the case, and that denial would result in an unfair trial. Id., 642 So.2d at 1221. If this burden is met, the trial court is to order the state to provide those funds. Id. A reviewing court examines a denial of funding under the abuse of discretion standard. See e.g., State v. Phillips, 05-1338 (La.App. 1 Cir. 3/29/06), 934 So.2d 162, 165 (finding the trial court did not abuse its discretion in denying the request for funds for a psychiatrist and a psychologist).
In the present case, the trial court denied defendant's request for funding in the following particulars: (1) a penalty phase investigator to controvert "the ongoing persuasive campaign for [defendant's] *138 execution" and to develop a claim of mental retardation; (2) a blood spatter expert to have proper analysis performed on crime scene blood evidence; (3) a fingerprint expert to match all prints taken from the Pace and Green murder scenes and point out problems with the State's fingerprint evidence; (4) a private investigation service to investigate the 26,000 other suspects in the serial killer investigation; (5) a venue consultant to assist in a motion to change venue; and (6) an eyewitness identification consultant to counter "four very dubious identifications apparently made of Mr. Lee in one of the cases against him." Although the trial court granted defendant $37,000 for a pathologist, a serial killer expert, a social worker, a tool mark expert, a psychologist, and DNA experts, he claims the award was woefully inadequate. The trial court also directed defendant to file with the Louisiana Indigent Defense Assistance Board to obtain more funding if the grant was insufficient. It appears no other funding was found.
After reviewing this voluminous record, it is clear defendant's DNA was conclusively linked to the body of the victim. There is nothing a blood spatter expert, fingerprint expert, private investigator, or eyewitness identification expert could have opined that would counter that fact. Defendant never alleged victim consent. As for the penalty-phase investigator, defendant was granted funds for two mental health experts to help establish mental retardation, namely psychologist Drew Grouvier and psychiatrist Sarah Deland. As discussed at length above on the issue of change of venue and the application of the Bell factors, an expert would not have altered the trial court's determination that venue was proper.
As to trial counsel's attempt to be relieved because of a burdensome caseload that would render his assistance ineffective, defendant failed to demonstrate counsel labored under such a workload. In stark contrast to this assertion, defendant's brief reproduces a statement the trial court made noting defendant "has two  over two attorneys. I know one is just helping out and may not be full-time with them, but nevertheless, he is here to help." Trial Tr. vol. XVI, 3948 (Aug. 25, 2003). Testimony was also adduced that defendant's lead counsel's caseload consisted of two cases, including defendant. Defendant refers to nothing in the record to support his contention trial counsel's workload prevented him from properly representing defendant. Compare State v. Peart, 621 So.2d 780, 789 (La.1993) (excessive caseloads and the insufficient support with which their attorneys must work may result in failure to provided effective assistance of counsel); see also e.g., State v. Robinson, 01-1305 (La.App. 4 Cir. 4/17/02), 820 So.2d 571, 582, writ denied, 02-1640 (La.5/31/03), 845 So.2d 1068 (relator failed to establish denial of effective assistance of counsel because his trial counsel had a heavy caseload, absent any specific evidence to substantiate his claim). After reviewing defendant's argument and the record of this case, we find this assignment of error lacks merit.
Guilt Phase
Other Crimes Evidence
Defendant next asserts the trial court's admission of other crimes evidence during the State's case-in-chief violated his due process rights.
In addition to presenting evidence of the charged crime involving Charlotte Murray Pace, the State also placed evidence before the jurors of four other homicides and one attempted homicide committed by the defendant: Gina Wilson Green, who died on September 24, 2001, at home (three doors *139 down from Pace's former residence) in her bed from manual strangulation; Pamela Piglia Kinamore, who had been kidnapped from her Baton Rouge home at night on July 12, 2002, whose body the police found four days later dumped in Whiskey Bay with her throat cut; Carrie Yoder, kidnapped from her Baton Rouge home on March 3, 2003, whom the police found 10 days later also dumped in Whiskey Bay, approximately one mile away from where Kinamore's body had been recovered, a victim of manual strangulation; Trineisha Dene Colomb, abducted from her car on November 2, 2002, in Scott, Louisiana (Lafayette Parish), whose body the police found on November 24, 2002, bludgeoned to death, in a wooded area some distance away from her abandoned vehicle; and Diane Alexander, who survived an attack in her Breaux Bridge home on July 9, 2002, by an assailant who tried to rape and strangle her and then fled the trailer when her son arrived home and interrupted the attack. Sexual assault kit testings indicated that Yoder, Kinamore, and Colomb had also been victims of sexual assault. Dr. Alfredo Suarez, a medical expert, reviewed pictures taken during the Green autopsy and opined that Green, too, was the victim of sexual assault.
Generally, courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. However, the State may introduce evidence of other crimes if the State establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, or preparation, or when the evidence relates to conduct which constitutes an integral part of the act or transaction that is the subject of the present proceeding. LA. CODE EVID. ANN. art. 404(B)(1). Nonetheless, the State must provide the defendant with notice and a hearing before trial that it intends to offer prior crimes evidence. State v. Prieur, 277 So.2d 126, 130 (La. 1973). Additionally, the State must prove the defendant committed the other acts. LA.CODE EVID. ANN. art. 1104; Huddleston v. United States, 485 U.S. 681, 690, 108 S.Ct. 1496, 1501-1502, 99 L.Ed.2d 771 (1988); State v. Crawford, 95-1352 (La. App. 3 Cir. 4/3/96), 672 So.2d 197, 207-208, writ denied, 96-1126 (La.10/4/96), 679 So.2d 1379. Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Hatcher, 372 So.2d 1024, 1033 (La.1979); State v. Sutfield, 354 So.2d 1334, 1337 (La.1978); State v. Jackson, 352 So.2d 195, 196 (La.1977); State v. Ledet, 345 So.2d 474 (La.1977). However, the jurisprudence has established an exception to the general inadmissibility of other crimes evidence to include evidence that shows modus operandi, particularly when the modus operandi employed by the defendant in both the charged and the uncharged offenses is so peculiarly distinctive one must logically say they are the work of the same person. See e.g., State v. Code, 627 So.2d 1373, 1381 (La.1993) (other crimes evidence admissible where they show similar distinctive handcuff ligature, overkill, predominant use of a knife, and need for domination and control of the victims to the extent of moving them from room to room). Lastly, the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. Hatcher, 372 So.2d at 1033.
In all, with testimony from investigating detectives, forensic DNA experts, and various other witnesses, the other crimes evidence in the present case is spread over 600 pages of testimony, slightly over half of all of the testimony presented during the guilt phase. As in the Pace *140 homicide, the State principally utilized DNA evidence to connect defendant to all the other homicides. Three of the connections were made by DNA experts with the Louisiana State Police Crime Laboratory (as in the Pace homicide), i.e., Angela Ross (for the Green case), Julia Naylor (for the Kinamore case; she was also the forensic expert who matched defendant's DNA to the samples taken from Pace's body) and Natasha Poe (for the Yoder case; Poe also made the match of defendant's buccal sample to the known profile of the South Louisiana Serial Killer). In Dene Colomb's case, Carolyn Booker with the Acadiana Crime Laboratory made the fourth match.
Additionally, the State relied upon two pieces of circumstantial evidence to connect the defendant to Yoder's murder and the attack on Alexander. The first was provided by a representative of Cingular Wireless in Carrie Yoder's case. Cingular's computer records showed defendant used a phone card to place two calls on March 3, 2003. These calls were captured and relayed along Cingular's network line by two of its cell phone towers outside Ramah and Grosse Tete, Louisiana, from I-10, near Whiskey Bay where Yoder's body was recovered. The second item of circumstantial evidence involved the telephone cord used in the attack on Diane Alexander. See infra.
Although the State mentioned during opening argument that some DNA evidence from the attacker's sweat had been recovered from the dress Diane Alexander was wearing at the time she was attacked, the State ultimately elected at the close of the evidentiary portions of trial not to introduce this piece of scientific evidence. Thus, the State relied solely on the eyewitness identification Alexander made of defendant, first in a photographic lineup emailed to her brother's home in Kentucky where she had sought refuge after the Task Force published her composite drawing of her assailant, and then in open court as she testified at trial. Alexander's son, Herman, who saved her life by fortuitously interrupting the assault as defendant was tightening a phone cord around his mother's neck, corroborated her testimony by identifying defendant's Mitsubishi car parked outside their mobile home when he arrived there. In addition, he noticed a phone cord dangling out of one of the windows as the attacker's vehicle sped from the scene. The cord was later recovered at Whiskey Bay several hundred feet away from the body of Pam Kinamore, who died only two days after the attack on Alexander. Mark Kurowski of the Acadiana Criminalistics laboratory, an expert in tool mark identification, matched the cut phone cord found inside the trailer after the assault ended to the telephone cord found near Kinamore's body at Whiskey Bay. Alexander's testimony further indicated she too had been the intended victim of a sexual assault, interrupted not only by the arrival of her son but also, initially, by defendant's inability to sustain an erection.
On the basis of extensive testimony adduced from numerous witnesses at a pre-trial hearing held on January 14 and 15, and March 30, and 31, 2004, the trial court ruled the other crimes evidence involving Green, Kinamore, Colomb, Yoder and Alexander was admissible "for the purpose of identity, motive, plan, system, and intent." Defendant unsuccessfully sought review of that ruling in this Court. State v. Lee, 04-1112 (La.6/4/04), 876 So.2d 77. As stated elsewhere in this appeal, this Court's pre-trial writ denial does not preclude reconsideration of the issue on the basis of the full trial record. State v. Fontenot, 550 So.2d 179 (La.1989).
In brief, the defendant attacks the introduction of all of this evidence primarily on grounds that the only conceivable *141 rationale for introducing the other crimes evidence in this case was on the sole contested issue at trial, i.e., the identity of Charlotte Pace's assailant. Defendant contends the circumstances of the other crimes were not sufficiently similar to establish a signature or modus operandi identifying the perpetrator in the charged and uncharged crimes as the same man.
Defendant contends the State presented evidence of other crimes of such "quantity and quality," as to eviscerate any hope that he could receive a fair adjudication. At issue is not whether defendant committed the other crimes,[14] but whether, as urged by the defendant, that admission of the evidence at trial was unduly prejudicial because it served no other purpose than to show the bad character of defendant, and not a larger and legitimate purpose of establishing motive, intent, system, or plan. The crimes, defendant claims, were so dissimilar that to present them to the jury inevitably resulted in undue prejudice. Defendant contends the evidence of the murders and one attempted murder the State introduced, including gruesome crime scene photographs and alleged testimony of the victims' good character, was not indicative of the modus operandi, plan, motive, or identity in the instant murder.
FBI Agent Mary Ellen O'Toole, an expert in criminal investigative analysis, testified for the State at the Prieur hearing about the victims' similarities and how they demonstrated a consistent modus operandi. Her analysis indicated all the victims were attractive, successful adult women. All the victims had "low-risk" lifestyles that would not likely put them in situations in which they could become a victim of violent crime. Moreover, all the victims were alert and not incapacitated at the time their attacks began, and each had recently traveled in the area. O'Toole noted the first confrontation by the victims' attacker was in a "comfort zone," most being in or near their homes. There were no signs of forced entry in any of the attacks. Each victim appeared to be disarmed nonviolently, with the attacks beginning only after they were subdued. All the victims were moved around their "comfort zones" during the attacks, and none of the victims appeared to have provoked their assailant's violence and anger.
O'Toole observed the perpetrator attacked each victim in a "high-risk" manner: first, the attacks occurred at times of the day when others could have been around; secondly, the killer's behavior was impulsive and directed at "low risk" victims, as opposed to "easier targets" like hitchhikers or prostitutes. O'Toole also found the attacks exhibited a very consistent pattern which exemplified the attacker's need for high risk, high thrill, and a sexual assault. To underscore her observation about the attacker, O'Toole noted there were neither signs of burglarious intent in any of the crime scenes nor any signs of remorse.
At the Prieur hearing, defendant emphasized the dissimilarities between the victims to counter the State's contention. He pointed out Pace died from exsanguination after being stabbed 81 times. Gina Wilson Green and Carrie Yoder were asphyxiated, Pamela Kinamore had her throat slashed, Trineisha Dene Colomb was bludgeoned to death, and Diane Alexander was being strangled when her attacker was scared off by the sudden arrival of her son. In stark contrast to defendant's assertions, it was the State's contention at the Prieur hearing that defendant chose Pace for the same reasons *142 he chose his other victims, but Pace may have put up a bigger "fight," one that defendant did not expect. As a result, the crime scene was more chaotic and the murder was more brutal than the other victims.
When confronted with defendant's contentions, O'Toole explained that the difference in Pace's murder resulted from defendant's perceived loss of control during the attack. She theorized that if Pace had backed off or attempted to escape her attacker, a different crime scene would have resulted. However, O'Toole opined this change did not mask the other consistent traits she found prior to the attack. Additionally, O'Toole stated all but one murder victim (Dene Colomb) died of wounds received to the neck.
The record shows the State introduced photographs of the victims and the crime scenes to illustrate the similarities of the physical injuries of each victim and their respective crime scenes. Moreover, the State elicited victim character testimony at trial to establish the background of each victim, to show their movements immediately before the attack, to demonstrate chain of custody of evidence, and in some instances, to show the condition of the crime scene when it was first encountered.
In addition to Agent's O'Toole's expert assessment of the commonality of these other crimes, there was one distinctive aspect of the four homicides involving Green, Kinamore, Yoder, and Colomb. As the DNA analyses shows, defendant left behind his distinct genetic signature in all four cases by depositing his virtually unique genetic material on the blouse worn by Gina Wilson Green at the time she died and on a towel in her home and in the bodies of Kinamore, Yoder, and Colomb.
Four analysts independently worked on the DNA matches. Three of the analysts, Ross, Naylor, and Poe, were employed by the same State Police Crime Lab police, but they worked from separate work stations with different computers, the fourth analyst, Booker, worked for a separate crime lab. The consistency of the DNA results, when viewed in the context of crimes involving Green, Kinamore, Yoder, and Colomb, not only produced a portrait that resembled the single attacker Agent O'Toole discussed, it also provided jurors an observable basis for concluding nothing was amiss with the DNA analysis of the samples in the Pace homicide. Moreover, the consistency of the DNA analyses in these other crimes further provided jurors with an experiential foundation to reliably identify defendant as Pace's assailant. To this extent, the State's other crimes evidence addressed any reluctance jurors might otherwise have had in returning a verdict based wholly on scientific evidence.
Furthermore, although the State ultimately chose not to present DNA evidence in the case of Diane Alexander, her eyewitness testimony, as partially corroborated by the testimony of her son who fortuitously interrupted the crime and saved her life, removed the issue of identity from the realm of abstract scientific analysis and statistical probabilities and presented it in a manner jurors could assess for themselves on the basis of their own experience  live testimony in court from witnesses whose demeanor they could observe as they responded to questions posed by the State and cross-examined by the defense. In turn, the eyewitness evidence Alexander provided was probative on the issue of defendant's identity in the Pace homicide because it also provided jurors with a basis to conclude that, given the similarities in the crimes Agent O'Toole discussed, the scientific test results correctly identified Pace's assailant.
*143 Accordingly, although the State's presentation of other crimes evidence occupied half of the guilt phase of trial, the State used this evidence against the defendant, not by asking jurors to convict defendant because of his criminal propensities, but on the basis of the genetic markers he left behind in a variety of similar circumstances over the course of a year. These genetic markers unmistakably identifying defendant as the assailant who claimed the life of Charlotte Murray Pace.[15] Accordingly, this assignment of error lacks merit.
Penalty Phase
Defendant's Mental Retardation Claim
In his first penalty phase argument, defendant contends he established by a preponderance of evidence that he is mentally retarded. Thus, he contends the imposition of capital punishment violates the Eighth Amendment to the United States Constitution.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that execution of mentally retarded persons constitutes an excessive punishment, and thus violates the Eighth Amendment. This Court addressed Atkins in State v. Williams, 01-1650 (La. 11/1/02), 831 So.2d 835, 861, and directed trial courts in post-Atkins hearings:
1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has `reasonable grounds' to believe a defendant is mentally retarded, [La.C.Cr.P.] art. 643; 2) to hold the hearing before a judge, not a jury; 3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-28:381 [defining retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior, and manifested during the developmental period"].
In response to Atkins and Williams, the Louisiana Legislature enacted 2003 LA. ACTS 698, which created LA. CODE CRIM. PROC. ANN. art. 905.5.1.[16] The code article provides for a procedure used in the event a defendant raises a claim of mental retardation. Under the article, *144 such a defendant has the burden of proving mental retardation by a preponderance of the evidence. LA.CODE CRIM. PROC. ANN. art. 905.5.1(C)(1).[17] The article defines mental retardation as:
a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(1).
The article concludes with an advisory list of several medical conditions which "do[] not necessarily constitute mental retardation." LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(2). Included in the list are mental illness, organic brain damage occurring after age 18, learning disabilities, speech and language disorders, and personality disorders. Id. In Atkins, the United States Supreme Court also suggested factors to consider for the determination of mental retardation:
clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.
Atkins, 536 U.S. at 318, 122 S.Ct. at 2250-51.
In the present case, defendant contends the record preponderates he is mentally retarded and not subject to execution. Defendant claims the test results of a Wechsler Adult Intelligence Scale, 3d Revision (WAIS III) and placement on the Vineland Adaptive Behavior Scale show him mildly mentally retarded. Dr. Drew Gouvier, a board-certified psychologist and neuropsychologist at Louisiana State University testified he found defendant mildly mentally retarded after interviewing defendant for about two hours, and his wife and mother for about two to three hours.[18] To support this claim, Dr. Gouvier stated defendant's full-scale WAIS score was 65, and that the Vineland test revealed deficits in communication/language[19] and capacity *145 for self-direction. Graduate students administered the tests. Dr. Gouvier also testified defendant's mental retardation onset occurred before the age of 22, and likely started when he was in grammar school, where he was in special education classes and had speech therapy. Dr. Gouvier further placed defendant in the bottom 2d percentile relative to his deficiencies. However, he only examined some of defendant's work and school records. Although Dr. Gouvier conceded not every person with an IQ below 70 is mentally retarded, he opined that it is skill deficits that are determinative of the issue. We note, however, in conflict with his stated opinion, Dr. Gouvier found defendant displayed "excellent skills" in the areas of community living and mobility.
Dr. Sarah Deland, a board-certified forensic psychiatrist employed with Tulane University, also examined defendant. She interviewed defendant for a total of six hours, and at first was unsure if defendant had suffered a brain injury or was mentally retarded. She testified she interviewed defendant with a skeptical eye, as she did with all the criminals she examined. While she did not administer any psychological examinations, she opined with reasonable medical certainty that based on the results of Dr. Gouvier's tests and her interviews, defendant is mildly mentally retarded. She observed several behaviors that are consistent with someone who is mentally retarded: an inability to remember the chronology of past events; a tendency to repeat themselves frequently; and the inability to understand abstract concepts. Dr. Deland concluded her observations of defendant and conversations with his wife and mother were consistent with the school and work records she reviewed. The psychiatrist also opined it was likely defendant's story of paying someone to take the commercial driver's license examination for him was truthful as it was "an outlier" when compared with his other examination performances. She also observed defendant had a history of violence toward women.
In response to defendant's witnesses, the State presented two lay witnesses and two expert witnesses. The first lay witness was Patrick Lawless, a former co-worker of defendant. Lawless testified defendant was a skilled "Class B Pipefitter" with whom he worked for approximately a year. Lawless testified defendant occasionally read and understood blueprints, and he had no difficulty conversing with co-workers. In short, defendant was "a regular guy" who liked to barbeque, party, and enjoy himself. In Lawless's lay opinion, defendant did not appear retarded in his interactions with him. Gary Robillard, a former supervisor of defendant, testified similarly. He stated defendant was a good employee who could read blueprints, and he was easy to talk to. Defendant began as a entry-level pipe fitter, progressed at work, and "was on his way" to being a "Class-A Pipefitter."
Dr. Donald G. Hoppe, a board-certified psychologist, testified for the State. Dr. Hoppe spent approximately two hours interviewing defendant and a little more time observing him before and after that interview. Dr. Hoppe also reviewed Dr. Gouvier's report and raw data, and found the WAIS administration adequate. However, Dr. Hoppe concluded defendant is in no way mentally retarded. He based his professional opinion on his interpretation of the WAIS results, interpreting them differently than Dr. Gouvier, and in part because of his review of defendant's school records. Succinctly stated, Dr. Hoppe testified one's IQ ranges over any period of time, and that the results presented by Dr. Gouvier and his students were only 66% reliable. In Dr. Hoppe's opinion, to *146 achieve a 95% level of confidence, the range must be expanded to place defendant's IQ somewhere between 62 and 70 at any given time. Dr. Hoppe continued that school IQ testing would provide a better analysis of defendant's IQ over time. After averaging nine IQ tests occurring between grades one and six, Dr. Hoppe found defendant had an average IQ as a child of 75.5, well over the clinical definition of mild retardation.[20] In his evaluation of defendant's mental retardation claim, Dr. Hoppe also looked to defendant's 91% passing grade on his DOTD commercial drivers exam, and his 88% final average from truck driving school. He also pointed out defendant averaged 79% in his work-related safety training exams. Looking at the totality of the information available to him, Dr. Hoppe concluded defendant qualified under no definition of mental retardation.
Next, the State called Dr. Robert Blanche, a board-certified psychiatrist working out of East Baton Rouge Parish Prison, to the stand. Dr. Blanche testified that after meeting with defendant for about three hours, and reviewing all data and interviews collected by others, he determined defendant was not mentally retarded.
Viewing defendant's assertions in light of the lay and expert testimony, we observe defendant's examples of mental retardation can just as easily be interpreted as a combination of malingering in front of testers and illiteracy or a learning disability. See LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(2)(j), (p) (learning disabilities and speech and language disorders do not necessarily constitute mental retardation).
An examination of the attacks on Green, Pace, Alexander, Kinamore, Colomb, and Yoder reveals one common thread among defendant's attacks  none of the crime scenes showed any signs of forced entry. An examination of Diane Alexander's testimony sheds light on the proposition that forced entry was unnecessary because defendant was a "smooth talker" and a charming man. Alexander testified that when she responded to the knock on the door of her mobile home, she found standing in front of her a neatly dressed African American male, clean shaven, but with a thin mustache, and groomed with a fresh haircut with a "neat razor line." The man introduced himself as "Anthony" and explained he was "supposed to be doing construction for some people in the area by the name of Montgomery." Alexander immediately assumed "he was lost because he was confident when he spoke." The man asked Alexander whether her husband knew the whereabouts of the Montgomerys, and when she said, "No," he then asked for a telephone book and a phone. Alexander gave him her cordless phone and a phone book and closed the door behind her. After a few minutes, she reopened the door to retrieve her phone. The man heard gospel music Alexander was playing that morning and told her he sang with a gospel choir. He continued to make small talk with Alexander and asked again whether her husband knew where the Montgomerys lived. This time, Alexander responded, "Look . . . my husband is not home." With that, defendant bulled his way through the door and launched his brutal attack on Alexander.
Thus, as described by Alexander, defendant's conduct was scarcely that of a man suffering from significant adaptive skills impairments. Instead, defendant demonstrated *147 he was capable of communicating with Alexander in such a way as to put her at ease until determining her husband was not home and he could easily overpower her with his considerable physical strength.
This is further evidenced by the fact defendant maintained two households during the time of the killings, one for his wife and children and one for his girl friend. The same is true when we examine defendant's encounter with the Zachary Police Department and the Attorney General's representatives when they obtained buccal swabbings from him. At that time, defendant did not simply accept the officers's assertion they had a subpoena duces tecum, he asked them for the court order authorizing the subpoena. Similarly, a reading of the transcript of defendant's interrogation shortly after his arrest in Atlanta reveals a person who stealthily dodged questions, formulated answers that were short on incriminatory statement, and long on talk about the possibility of book deals based upon the serial murder case. In the end, reality belies defendant's present claim he has communication skills that fall in the bottom two percentile.
Merely because defendant wrote "okay, thanks" in response to a teacher evaluation, does not equate to retardation or an inability to communicate. Those people who worked with defendant on a daily basis testified he appeared like a regular guy and he had no difficulty working or speaking. Defendant's ability to successfully pass an oral drivers test, but fail a written commercial drivers test, is as easily explained by an inability to read as it is minor mental retardation. The complexity, scope, planning, and relative skill with which defendant committed a string of violent murders and evade capture contradicts any claim he is somehow "slow" and unable to grasp abstract concepts as Dr. Deland testified. Defendant displayed a survival mentality with great assuredness time and again when he took great lengths to cover up his crimes and hide evidence. Defendant escaped detection and capture for nearly two years while he committed a series of gruesome murders. Defendant's placement in special education during grammar school is also not necessarily indicative of retardation. His poor academic performance is again just as easily explained by a learning disability as it is mental retardation.
The jury heard expert and lay witnesses from both the State and defense. The jury's unanimous decision that defendant is not mentally retarded, and thus that he failed to carry his burden of proof, is neither irrational nor arbitrary. LA.CODE CRIM. PROC. ANN. art. 905.5.1(C)(1). Defendant failed to show "significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills" LA.CODE CRIM. PROC. ANN. art. 905.5.1(H)(1). This claim fails.
Capital Sentence Review
Under LA.CODE CRIM. PROC. ANN. art. 905.9 and LA. S.CT. Rule 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge in the present case has filed the Uniform Capital Sentence Report ("UCSR") required by LA. S.CT. RULE 28 § 3(a) and the Department of Public Safety and Correction submitted a *148 Pre-sentence Investigation Report ("PSI"). See LA. S.CT. RULE 28 § 3(b). In addition, the State filed a Sentence Review Memorandum.
Those documents indicate the defendant, Derrick Todd Lee, is an African-American male born on November 5, 1968 in Baton Rouge. He lived in St. Francisville for most of his life. He is married, and has three children. However, Lee and his wife have had a tumultuous relationship for many years, and there have been reports Lee beat her on occasion. He also had a longtime girl friend with whom he kept a separate household, and with whom he also was physically violent. Although both his parents are still alive, he was primarily raised by his mother, on whom he was overly dependent. He also developed a close relationship with his stepfather, and did not meet his biological father until he was 21 years of age. Lee has 13 siblings and half-siblings, but the families are split along lines of paternity.
A self-described loner in his childhood, Lee performed poorly in school, had chronic asthma, and underwent speech therapy. He was enrolled in special education classes for the majority of his schooling. Lee completed the eleventh grade before dropping out. Lee has apparently never obtained a GED.
After dropping out, Lee went through a succession of jobs as a pipe fitter, sandblaster, painter, boiler maker, tool lifter, and cement finisher. Lee also obtained a commercial driver's license and drove a truck hauling chemicals for six months.
Defendant has an extensive criminal history, and has spent periods of his life incarcerated. Lee's only juvenile offense was a conviction for simple burglary in 1981. As an adult, defendant was convicted of: (1) attempted unauthorized entry of an inhabited dwelling (1988, one year at hard labor, suspended and placed on two years of probation); (2) disturbing the peace (1990, bench probation for one year); (3) simple burglary of an inhabited dwelling (1992, four years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for one year); (4) "Peeping Tom," resisting arrest by flight, and criminal damage to property (1995, six month suspended sentence with two years of bench probation); (5) two counts of "Peeping Tom" (1997, two years supervised probation); (6) stalking (1999, six month suspended sentence, two years supervised probation that was ultimately revoked); and (7) aggravated flight (2000, two years imprisonment at hard labor).
Defendant has been positively linked to the murders of several women in south Louisiana, and is strongly suspected of being responsible for the murders of many more. At trial Lee was also shown responsible for the attempted murder and attempted aggravated rape of Diane Alexander in Breaux Bridge, Louisiana.
Passion, Prejudice, or Other Arbitrary Factors
The record does not provide any indicia of passion, prejudice, or arbitrariness. Defendant, an African-American male who was 33-years of age at the time of the offense, raped and killed a 22-year-old woman. Additionally it was proven he was responsible for the deaths of at least four other women, and the aggravated rape and attempted murder of another. He received a unanimous sentence of death from a unanimous jury of 12 persons. A jury of twelve persons was presented with credible evidence in addition to defendant's behavior that led them to reject his mental retardation defense and to return a verdict of death. No prejudice is apparent.
Aggravating Circumstances
The jury returned the verdict of death, after finding Charlotte Murray Price died *149 during the commission of an aggravated rape or attempted aggravated rape. LA. CODE CRIM. PROC. ANN. art. 905.4(A)(1); see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see also Trial Tr. vol. XII, 2919 (Oct. 14, 2004) (penalty phase verdict form). As discussed supra, the aggravating circumstances relied upon by the State were fully supported by the evidence. Defendant's DNA was found in and on the victim who was stabbed 81 times and subsequently died of exsanguination. Consequently, defendant's sentence of death is firmly grounded on the finding of this aggravating circumstance.
Proportionality Review
Although the Federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty was disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d at 9.
The State's Sentence Review Memorandum reveals that since 1976, jurors in the 19th Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 24 occasions, including the present case. Several of the salient features of the case sub judice make it similar enough to other death sentences recommended by juries in the 19th JDC that defendant's sentence is not disproportionate. See, e.g., State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377 (defendant robbed victim over the age of 70 and strangled him with his shoelaces and an electrical cord); State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675 (defendant raped and slashed throat of 12-year-old victim, stomping her face as he left); State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396 (defendant robbed and raped 67-year-old woman in her home, then killed her by repeatedly stabbing her, slashing her throat, and dropping a couch on her face); State v. Tilley, 99-0569 (La.7/6/00), 767 So.2d 6 (defendant killed a 68-year-old man repeatedly stabbing him during the course of an armed robbery in the parking lot of a Burger King); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (defendant repeatedly and viciously stabbed two people during a home invasion); State v. Jones, 474 So.2d 919 (La.1985) (defendant kidnapped 11-year-old victim, beat her, raped her, and choked her to death, eventually dumping her body in a drainage canal).
The cases above provide strong support for an argument the death penalty imposed in this case is not disproportionate. It is also appropriate for this Court to look beyond the 19th JDC and conduct the proportionality review on a statewide basis. Cf. State v. Davis, 92-1623 (La.5/23/94), *150 637 So.2d 1012, 1030-31. Cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding the defendant killed the victim in the course of an aggravated rape. See, e.g., State v. Harris, 01-2730 (La.1/19/05), 892 So.2d 1238; State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055; State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974; State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022; State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Wille, 595 So.2d 1149 (La.1992); State v. Lee, 559 So.2d 1310 (La.1990); State v. Copeland, 530 So.2d 526 (La.1988); State v. Eaton, 524 So.2d 1194 (La.1988); State v. Carmouche, 508 So.2d 792 (La.1987); State v. Williams, 490 So.2d 255 (La.1986); State v. Loyd, 489 So.2d 898 (La.1986); State v. Jones, 474 So.2d 919 (La.1985); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 111, 105 S.Ct. 2345, 85 L.Ed.2d 862, rehearing denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985).
Because this Court has overwhelmingly upheld death sentences in such cases, and due to the heinousness of the brutal killing as described above, we find the death sentence imposed in this case is not disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this Court under LA.CODE CRIM. PROC. ANN. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by LA.REV. STAT. ANN. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under LA.REV.STAT. ANN. § 15:149.1; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.
JOHNSON, Justice, concurs and assigns reasons.
JOHNSON, J., concurs and assigns reasons:
This case affords us the opportunity to give clear direction to the trial courts as to when they should rule on a motion to change venue.
Defendant filed his motion to change venue on July 17, 2003, then supplemented his motion on January 30, February 6 and February 27, 2004. As is the practice with many trial judges, the court deferred ruling on the motion until after the trial commenced with jury selection on September 13, 2004.
LSA-C. Cr. P. art. 622 provides, in pertinent part:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
*151 A defendant must prove more than mere public general knowledge or familiarity with the facts of the case, to be entitled to have his trial moved to another parish. State v. Frank, 99-0553, p. 16 (La.1/17/01), 803 So.2d 1, 16 ("there is no "bright line" test for determining the degree of prejudice existing in the collective mind of the community . . . the defendant must show the extent of prejudice in the minds of the community as a result of knowledge or exposure to the case before trial"); State v. George, 37,492, 10 (La.App.2d Cir.9/24/03), 855 So.2d 861, 870 (defendant is not entitled to a jury entirely ignorant of the case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime).
The jurisprudence shows that the usual practice among trial judges is to wait for voir dire examination of prospective jurors to determine whether jurors can lay aside their impressions or opinions, and render a verdict based on the evidence presented in the case. There has heretofore been no "bright line" rule to give trial courts guidance as to when the motion for change of venue, must be decided. The result is that the defendant who is required to wait for voir dire examination before winning a change of venue, is prejudiced, when compared to the defendant who won the change of venue, pre-trial.
Recently, in State v. Montz, 07-K-0653, (La.11/21/07) 968 So.2d 727, this Court suggested that the better practice is to rule on the defendants' motion to change venue, pre-trial. In Montz, the trial court granted the pre-trial motion after the defendants introduced into evidence over 140 articles published or broadcast between January and August 2005, concerning the death of Levon Jones, at Club Razzo in New Orleans, Louisiana.[1] At the hearing on the motion to change venue, the defendants presented the testimony of their pollster, Joe Walker, who testified that based on two polls he conducted in the Summer of 2005 (pre-Hurricane Katrina) and one taken in February 2006, the results revealed that 98% of those polled were familiar with the facts of the case.
Here, in support of the motion for change of venue, defendant filed into evidence over 5,000 pages of printed media reports and newscast transcripts published between July 2002 and January 2004 that related to the South Louisiana Serial Killer. The trial court deferred the defendant's motion for change of venue until after jury selection. The majority concludes that this media coverage was not prejudicial since the coverage was factual and not inflammatory. The jury pool consisted of 1,300 persons and over 98% of prospective jurors polled had heard something about the case, from either media outlets or acquaintances. Nevertheless, the trial court denied the motion to change venue
Our jurisprudence is replete with instances where despite high exposure to publicity before the trial, the trial judge denied the motion for change of venue, and this Court held that such denial did not result in reversible error. In State v. Frank, supra, voir dire demonstrated that 110 out of 113 venire members (97%) had *152 been exposed to some publicity surrounding the case, and 89% of the prospective jurors indicated they had been exposed to information about the case on more than one occasion or from multiple sources. See also Hoffman, 98-3118 at p. 9, 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); [72 out of 90 prospective jurors (80%) had awareness of the case before trial]; State v. Connolly, supra, [although 120 out of 139 potential jurors (86.33%) possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts].

Conclusion
When we consider the fact that 97% and 98% of the prospective jurors in Frank, Montz, and in this case, were exposed to pre-trial publicity and were familiar with the facts of the case, yet the trial judges reached disparate results on the question whether the jurors could put aside preconceived notions as to the guilt or innocense of the defendant, and make an unbiased judgment, my preference would be appellate review, pre-trial, of whether the trial court abused its discretion, rather than a review of this issue at the end of a very expensive trial on the merits.
NOTES
[1] The record shows the receipt the carwash provided definitively established the time she was there. This fact was further corroborated by surveillance films of the carwash at the time Pace was on the premises.
[2] Julia Naylor, the forensic analyst with the Louisiana State Police Crime Lab, testified that trace evidence is usually referred to as very minute samples, such as hair. Trace evidence is almost anything that if you move the body of a victim it could get lost, damaged or contaminated.
[3] The room is darkened as much as possible and a blue light is shone. In the present case, room darkness was achieved by closing the bedroom door and hanging either cloth or black paper over the bedroom window. The technician, through the use of a pair of orange glasses, was then able to see biological stains which fluoresce in the blue light.
[4] As noted in Dr. Cramer's autopsy report, Pace received blunt head injuries, including a fractured skull and blunt trauma to the eyeballs. Such injuries would have been consistent with blows inflicted with the iron.
[5] At the time of trial the whereabouts of Dr. Michael Cramer were unknown. Dr. Cramer also performed the autopsies of Gina Wilson Green and Carrie Yoder.
[6] A review of the record shows a vaginal washing is obtained when the medical examiner, using a syringe containing sterile water, injects the sterile water into the vaginal area and then the liquid is suctioned out and placed into a tube for laboratory analysis.
[7] Neither the Zachary Police Department nor the Louisiana Attorney General's Office were members of the Multi-Agency Homicide Task Force.
[8] So as not to be confusing, we point out that defendant, Derrick Todd Lee, was also indicted in West Baton Rouge Parish with the first-degree murder of Geralyn Barr DeSoto, a violation of LA.REV.STAT. ANN. § 14:30. The State later amended the indictment to charge defendant with second-degree murder, a violation of LA.REV.STAT. ANN. § 14:30.1. The defendant pled not guilty and his trial began in West Baton Rouge Parish on August 2, 2004. After a trial by jury, defendant was found guilty as charged and the trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The Court of Appeal, First Circuit, affirmed defendant's conviction and sentence. State v. Lee, XXXX-XXXX (La. App. 1 Cir. 5/16/07), 964 So.2d 967.
[9] In the present case, the subpoena duces tecum commanded Lee "to produce a DNA specimen, instanter . . . and herein fail not under penalty of law." As provided in LA. CODE CRIM. PROC. ANN. art. 66(B), "[t]he contumacious failure or refusal of the person subpoenaed to appear is punishable as a contempt of court."

As an ancillary to that provision, it is also recognized in the jurisprudence that a person subpoenaed or ordered to appear may at any time seek protection by the court from hardship or abuse of process by moving to modify or quash the subpoena or order. See In re, Grand Jury Subpoenas, 363 So.2d 651, 655 (La. 1978) (recognizing the motion to quash in the context of a grand jury subpoena). As authority for the motion to quash, the court in In re, Grand Jury Subpoenas cited LA.CODE CRIM. PROC. ANN. art. 17 where it is recognized the district court possesses inherently all powers necessary for the enforcement of its orders and the performance of its duty to require that criminal proceedings be conducted with dignity, orderliness and justice. In addition, LA.CODE CRIM. PROC. ANN. art. 732 provides: "A subpoena may order a person to produce at the trial or hearing, books, papers, documents, or any other tangible things in his possession or under his control, if a reasonably accurate description thereof is given; but the court shall vacate or modify the subpoena if it is unreasonable or oppressive." While in its brief the State argues that the recipient of the subpoena duces tecum can challenge its requirements before a magistrate, the subpoena at issue in the present case ordered the production of the DNA sample instanter, thus not allowing such a challenge here.
[10] Voir dire examinations spanned from September 13, 2004 to October 4, 2004.
[11] For other cases in which a change of venue was denied see State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810, 815 (although 120 of 139 potential jurors (86%) possessed some knowledge of the crime, most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La.1985) ("Although a majority of prospective jurors (i.e., 24 of 39 or 62%) admitted exposure to pre-trial publicity, only four (10%) were excused for cause on ground of their formation of a fixed opinion."); State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors recalled details of crime and only six out of 24 (25%) jurors in the last two groups questioned indicated that their knowledge would not affect their decision whereas 47% conceded prior knowledge would); State v. David, 425 So.2d at 1247 (out of 112 jurors, 27 (24%) had read or heard about the case, but only six of those 27 had an opinion, and all four jurors [3%] who said that they could not put their opinion aside were excused for cause); State v. Rodrigue, 409 So.2d 556, 559 (La. 1982) (in a mock voir dire set up in order to determine the impact of media coverage by the court, 26 of 30 prospective jurors had read about the case, but only nine (30%) had fixed an opinion which satisfied the court that a jury could be chosen in that parish); State v. Wright, (La. App. 2 Cir. 5/19/06), 931 So.2d 432 (of 44 prospective jurors, 15 indicated that they had neither read nor heard anything about the case and while 11 challenges for cause were granted, not all were granted on the issue of media coverage (no more than 22%), and only 6 had formed an opinion regarding guilt); State v. George, 37,492, 855 So.2d at 871 (of 40 persons questioned during voir dire, only eight (20%) were excused because of the pre-trial publicity and its taint); State v. Hundley, 99-1156, (La.App. 3 Cir. 3/22/00) 760 So.2d 417, 419 (pretrial publicity did not taint jury pool to extent that it was impossible for murder defendant to receive a fair trial, and thus, defendant was not entitled to change of venue, when 15 out of 60 prospective jurors (25%) were excused for cause based on pretrial publicity, and defendant used only 11 of his 12 peremptory challenges); State v. McLemore, 26,106 (La.App. 2 Cir. 6/24/94), 640 So.2d 847, 855 (no error where 100% of 36 potential jurors had heard or read something about the case and of that number, seven (19%) reported that they had a fixed opinion, and three jurors dismissed for cause (8%) because remaining prospective jurors demonstrated only a cursory familiarity with the case and all denied that published accounts of the case would affect their ability to apply the law fairly); see also Mills v. Singletary, 63 F.3d 999, 1011-12 (11th Cir. 1995) (newspaper articles and television reports about victim's murder and defendant's arrest did not give rise to presumption of prejudice necessary to require change of venue in capital murder case on grounds of pretrial publicity; most newspaper articles did not mention defendant and instead reported on progress of search for victim, articles that mentioned defendant did so in context of reporting unfolding case, there were no editorials concerning case, and less than 15% of jury venire was excused for bias); Knapp v. Leonardo, 46 F.3d 170, 177 (2d Cir.1995) (jury not prejudiced though extensive pretrial publicity resulted in dismissal of 83% of 1,417 venirepersons for cause because jurors questioned regarding publicity only had vague recollection of press coverage and said nothing they might remember would prevent them from reaching a fair judgment).
[12] The constitutional standard of fairness requires a defendant have a panel of impartial, indifferent jurors. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). To hold the mere existence of any preconceived notion about the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), citing Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1642. "At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Id.
[13] As noted by the West Baton Rouge Parish trial court during the DeSoto case, there was unlikely to be anyone in the state who had not heard of the South Louisiana Serial Killer.
[14] At no time in brief or in argument before us does the defendant contend the evidence was insufficient to prove the other crimes relied upon by the State.
[15] Cf. Old Chief v. United States, 519 U.S. 172, 187, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997)("Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.").
[16] Defendant claims that LA.CODE CRIM. PROC. ANN. art. 905.5.1 is unconstitutional in that it calls for a jury to make the determination of mental retardation rather than through a pre-trial determination by the court. Moreover, defendant claims the guilt phase verdict form and jury instructions created an unacceptable risk that individual jurors were prevented from finding mental retardation existed because the jury was required to find retardation unanimously.

As an initial matter, this Court has already throughly addressed the claim that LA.CODE CRIM. PROC. ANN. art. 905.5.1 is unconstitutional and found it without merit. State v. Turner, 05-2425, p. 12 (La.7/10/06), 936 So.2d 89, 99 ("[n]either Atkins nor other controlling legal principles compel the selection of a specific fact finder regarding mental retardation or require the determination be made at a specific point in the adjudication process.").
As to the jury instructions, defendant failed to object to it and thus waived the claim here. LA.CODE CRIM. PROC. ANN. art. 801(C); LA.CODE CRIM. PROC. ANN. art. 841; State v. Draughn, 950 So.2d at 622 (applying LA.CODE CRIM. PROC. ANN. art. 801(C) to claims of jury instruction error); State v. Wessinger, (La.5/28/99), 736 So.2d at 180 (applying contemporaneous objection rule to penalty phase errors short of Rule 28 arbitrary facts in penalty phase of a capital trial).
[17] In a significant departure from the procedures established by this Court in Williams, the new legislation calls for a jury to determine whether a defendant is exempt from capital punishment by reason of mental retardation.
[18] Dr. Gouvier admitted there were aspects of defendant's psychological history he was given that were impossible to verify and that it was possible he could get a false impression of defendant's history from his wife and mother. Dr. Sarah Deland, a forensic psychiatrist, noted a similar motivation of family members to be less than truthful in their testimony.
[19] His communications deficit was not "grossly" deficient. Furthermore, on another test, defendant was scored as having an IQ of 81. That test, however, had a lowest possible score of 80, and was said less reliable.
[20] It should be noted one of the component scores of the average IQ was a 91, achieved after defendant repeated the fourth grade.
[1] On December 31, 2004, Levon Jones, an African-American college student athlete from Georgia was celebrating New Years Eve on Bourbon Street with a group of friends and family members. The group was denied admission to Razzoo's Bar, purportedly because of a dress code violation by one of the group members. During an ensuing scuffle, Jones was fatally injured by the bar's security personnel (a/k/a "bouncers") stationed at the barroom entrance. Several bystanders videotaped the incident and those videotapes subsequently were shown in the television coverage of the student's death.