KNOLL, Justice,
dissenting.
1, Finding under the provisions of La. Civ.Code art. 1944 and our civilian tradition Dianne and Herman Alexander are entitled to the rewards offered to the public by the Lafayette Crime Stoppers, the Lafayette Chamber of Commerce, and the Baton Rouge Crime Stoppers, I would grant this writ and render judgment awarding the rewards to the Alexanders. Accordingly, for the following reasons, I dissent from the majority’s writ denial.
To fully understand the significance of the present case, it is important to recall the tragic facts of the South Louisiana Serial Killer-Derrick Todd Lee case:
Charlotte Murray Pace, was a pretty 22 year old who had just graduated from Louisiana State University (LSU) as one of the youngest recipients of a MBA degree....
On Friday, May 31, 2002, after leaving ... work, Pace washed her newly acquired 1999 BMW at approximately 11:52 a.m. and then went to her Baton Rouge townhouse at 1211 Sharlo that she shared with Rebecca Yeager, a close friend for six years, to await Rebecca’s scheduled 1 p.m. arrival.... When Rebecca arrived at 2:00 p.m., she found Pace’s almost completely nude body lying on the floor between the bedroom door and the bed. She observed blood all over the room, on the furniture, and all over the floor; the bed was made, but the bedspread was blood-soaked. She later also found blood in the kitchen and in the hallway to the bedroom. She saw Pace had many small holes in her chest and stomach, and Pace’s throat was cut open. Unable to find the townhouse’s portable phone, Rebecca used her cell phone to call a 9-1-1 operator and then flagged down a passing police car.
*283 [[Image here]]
Dr. [Michael] Cramer’s autopsy report enumerated 81 different wounds to Pace’s body and opined that the cause of death was exsanguination. He theorized that two patterns of stab wounds were present: one resembling lesions caused by a flat bladed screwdriver and the other resembling incised wounds from a knife. He also found Pace ^sustained blunt injuries to the head with a fractured skull and blunt trauma to the eyeballs, together with multiple bruises to the upper and lower extremities. The heart, the liver and the lungs were perforated three times each; there was also a stab wound to the left area of the eyeball that penetrated into the cranial cavity after fracturing the left frontal bone. In addition, there was an impressive wound at the top of the neck with transection of the cartilage and the esophagus accompanied with a severed left jugular vein.
Dr. Alfredo Suarez, an expert pathologist who reviewed Dr. Cramer’s autopsy report and the accompanying photographs, told the jury there were a number of defensive wounds on Pace’s arms, forearms, hands and wrists inflicted as she attempted to ward off her assailant. He agreed with Dr. Cramer’s opinion that Pace died as the result of exsangui-nation.
$ ⅜ ‡
At the time of Pace’s rape and murder, there were other unsolved violent rapes and murders of women in the Baton Rouge and Lafayette areas that caused the police to further investigate these homicides. Indeed, some time later when the DNA analysts in the State Police Crime Lab compared notes on DNA samples recovered from several victims of these unsolved homicides, it showed that a single perpetrator had committed the unsolved homicides of these women. The perpetrator was thus deemed a serial killer....
On September 24, 2001, eight months prior to Pace’s death, Gina Wilson Green, an attractive, successful registered nurse 40 years of age, was found strangled and raped just three doors away from Murray’s townhouse....
⅜ ⅝ ⅝
Approximately five weeks after Pace’s murder, on July 8, 2002, Angela Ross and Julia Naylor, the two DNA analysts with the Crime Lab who had independently obtained DNA profiles in the Green and Pace murders, compared the DNA results in their respective cases. Immediately, it became apparent to them that the results from the DNA samples they independently examined in their respective cases indicated that a single perpetrator committed those homicides.
On July 9, 2002, Diane Alexander, an attractive nurse, was attacked at her home in Breaux Bridge, about 45 minutes west of Baton Rouge, in rural St. Martin Parish. On the morning of July 9, Alexander was getting ready for work when a black man, who identified himself as Anthony, knocked on her locked front door, asking for directions to the Montgomerys’s. When Alexander said she did not know the Montgomerys, the man asked to use the telephone. He then asked her if her husband might know the Montgomerys. When she eventually informed him that her husband was not at home, the stranger’s demeanor quickly changed. He forced his way into the mobile home and overpowered her. The intruder caught her by the throat, told her not to try anything because he was armed with a knife *284 and that he would poke her in the eye. He then attempted to rape her, but he could not maintain an erection. He then bludgeoned her and attempted to strangle her with a telephone cord he cut from the home computer that was close at hand.
| sAlexander placed her hand between the telephone cord and her neck in an effort to stop her strangulation. She was passing in and out of consciousness when fortuitously her son, Herman, arrived at the residence. When the intruder heard Herman’s car approach on the gravel driveway, the attacker ran out the backdoor. Herman saw the unfamiliar car at his parents’s home. He described it as a gold Mitsubishi Eclipse with a “Hampton Has It” plate on the front and further noted it had a dent in the hood. He also observed a beige telephone cord hanging out of the car window.
When he entered the home, Herman found his mother on the floor, lying in a pool of blood. Alexander had a skull fracture and she was rushed via helicopter to a Lafayette hospital where she remained for five days. Crime scene personnel from St. Martin Parish secured evidence from the scene of the attack. Two significant items were preserved and logged into evidence for future forensic analysis: the severed end of the telephone cord that was cut from the computer and Alexander’s dress with DNA evidence on it.
On July 15, 2002, Alexander gave a detailed description of her attacker to Detective Arthur Boyd of the St. Martin Parish Sheriffs Office. Through her description, a composite sketch of the attacker was made. The evidence from this crime scene and the sketch, which bore a striking resemblance to the defendant, would later become vital in resolving who the perpetrator was in the unsolved homicides of the women in the Baton Rouge and Lafayette areas. Despite the existence of this sketch, at this time the investigation leads were focused on an unknown white male driving a white pickup truck.
Just three days after Alexander’s attack, Pamela Piglia Kinamore, a beautiful 44-year-old antique shop owner, was reported missing from her Baton Rouge home. On July 12, 2002, Kinamore’s husband, Byron, arrived at their home in Briarwood Place at about 11:45 p.m. He found a full bathtub, spots of blood on a bedroom rug, and a minor dishelving of the bedroom furniture. His wife Pam was not at home.
Three days later, on July 16, 2002, a survey crew found a body just south of the Whiskey Bay exit on Interstate 10. Crime scene investigators also found a piece of telephone cord a few hundred feet from the body; later, forensic analysis would match this piece of cord to that cut from the home of Diane Alexander three days earlier. The body, which had been exposed to three days of summer heat, was initially unidentifiable. Only though the use of dental records was the body identified as being that of Pamela Piglia Kinamore.
An autopsy revealed that Kinamore had been strangled and three significant cut wounds, five and a-half, five, and four inches long, were evident in the neck. These neck wounds cut through the skin, the windpipe, below the larynx and the opening of the airway, and opened the right carotid artery and both jugular veins. A sexual assault kit was also utilized because there was physical evidence of forceful penetration of the vagina and the anus. Defensive injuries were seen on Kinamore’s left hand, the right hand, the left elbow, the back of *285 the forearm, the back of the arm, and the knees.
[[Image here]]
|/Through scientific testing a DNA profile was procured. Although the profile did not produce a complete set of markers because of the body degradation, it was sufficiently extensive to genetically identify Kinamore’s attacker as the same person who murdered Green and Pace.
Thereafter, police officials realized they were looking for the same perpetrator in multiple murders and a Multi-Agency Homicide Task Force was formed in August 2002 to track down the killer.
On November 21, 2002, Trineisha Dene Colomb, an attractive 23-year-old woman, disappeared from her Lafayette home. Her car, purse, and keys were found in Grand Coteau near the cemetery where her mother had been buried approximately seven months earlier. Three days later a hunter found Co-lomb’s body in the woods near Scott, Louisiana. She was wearing only a T-shirt, bra, socks and tennis shoes. Investigators found a pair of fleece pants and a pair of underwear in underbrush near the body. A pool of blood about 30-feet from the body was found and there was evidence the body was dragged through mud to where it was found by the hunter. A forensic pathologist determined Colomb died of blunt force trauma to the head. During the autopsy, the pathologist also obtained a sexual assault kit, took swabbings, and submitted the kit for forensic investigation .... The [DNA] profile was consistent with the DNA profile generated in the Green, Pace, and Kinamore murders.
Lastly, on March 3, 2003, Lee Ellis Stanton reported his girl friend, Carrie Yoder, a beautiful 26-year-old graduate student at LSU, disappeared from her home near campus. Stanton reported that he entered the residence through an unlocked window; after entering the residence, he discovered the front door unlocked. Other than a key holder that was askew, a broken necklace, and a small amount of blood on Yoder’s purse, there was no indication of a struggle at Yoder’s residence.
After days of searching, a commercial fisherman found Yoder’s body on March 13, 2003, partially submerged at Whiskey Bay not far from where Kinamore’s body had been found. Upon forensic examination and a complete autopsy, it was determined Yoder was raped, strangled, beaten, and stomped. A sexual assault kit was utilized during the autopsy and a complete DNA profile was obtain .... [which] was consistent with the DNA profiles obtained in the Green, Pace, Kinamore, and Colomb murders.
State v. Lee, 05-2098, pp. 2-11 (La.1/16/08), 976 So.2d 109, cert. denied, - U.S. -, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008).
Relevant to the instant case, in April 2003, the Lafayette Chamber of Commerce, the Lafayette Crime Stoppers, and Baton Rouge Crime Stoppers offered to the public “a reward of $50,000 for information relating to the murders of five south Louisiana women” and a “$100,000 reward for information on the South | ¡^Louisiana Serial Killer and leading to the arrest and indictment of the South Louisiana Serial Killer,” respectively.
When the murder of Colomb, Lee’s first confirmed victim in the Lafayette area of African American descent, was linked to the South Louisiana Serial Killer, Det. Boyd began to entertain the possibility the *286 South Louisiana Serial Killer and Mrs. Alexander’s attacker could be the same man. In May 2003, he shared the information regarding Mrs. Alexander’s attack with the Lafayette Parish Sheriffs Office, who in turn shared the information with the Task Force. Consequently, the Task Force coordinated an interview of Mrs. Alexander in May 2008 by Agent Mary Ellen O’Toole, an FBI behavioral scientist assisting the Task Force.
Mrs. Alexander unquestionably conveyed information relating to the South Louisiana Serial Killer to Agent O’Toole on May 22, 2003. After this interview and after obtaining a composite sketch from Mrs. Alexander’s information, the Task Force released to the public through television and print media the composite as a depiction of the South Louisiana Serial Killer as well as Herman’s description of the attacker’s fleeing vehicle on May 23, 2003. Within hours, callers contacted officials, stating “I’m looking at Derrick Todd Lee,” “The car is in his mother’s front yard.” See Lee, 05-2098 at pp. 28-29.
While a swab of Derrick Todd Lee’s DNA had already been taken by the Attorney General Investigator on May 5, 2003, it had not yet been tested. However, after the release of the composite and the positive identification of the sketch by members of the public, there was a rush to complete Lee’s DNA profile. Without a doubt, this composite sketch and the vehicle description was crucial in identifying Lee as the South Louisiana Serial Killer.
Additionally, after the sketch was released and DNA linked Lee to the killings, |6the Task Force presented Mrs. Alexander with a photographic lineup, and on May 25, 2003, she identified Lee as her attacker. After this identification, a press conference was held on May 26, 2003, where Lee’s name was released to the public as the South Louisiana Serial Killer. Lee was apprehended the next day in Atlanta, Georgia. Unquestionably, it was the publication of Diane and Herman Alexanders’ information that brought Derrick Todd Lee’s killing spree to an end.
All of this information given by the Alexanders, which led to the Lee’s arrest, expedited DNA testing, indictment, conviction, and affirmation of that conviction by this Court,[1] was given and provided to law enforcement prior to August 1, 2003. Importantly, after Mrs. Alexander survive a brutal sexual assault by Derrick Todd Lee, it was her information and her son’s information conveyed to law enforcement officials that led directly to Lee’s identification, arrest, indictment and conviction.
On or about August 14, 2003, after the deadline for the reward had expired, Mrs. Alexander contacted Craig Stansbury of the Lafayette Crime Stoppers to inquire about the advertised reward. She identified herself as a victim of Derrick Todd Lee who has provided information that led to his arrest. After being told she was ineligible to receive the award, Mrs. Alexander and her son filed this lawsuit on February 22, 2006, against both the Baton Rouge and Lafayette Crime Stoppers. In response, these defendants filed a motion for summary judgment, which was granted by the District Court and affirmed by the Court of Appeal, Third Circuit. Alexander v. Lafayette Crime Stoppers, Inc., 09-927 (La.App. 3 Cir. 2/3/10), 28 So.3d 1253. The majority of this Court denied writs, finding the Alexanders were not entitled to the rewards. Alexander v. Lafayette *287 Crime Stoppers, Inc., 10-814 (La.7/2/2010), 38 So.3d 282, 2010 WL 2737034. With all due respect, I strongly disagree and find the Alexanders are clearly entitled to the rewards.
La. Civ.Code art. 1944 provides:
An offer of a reward made to the public is binding upon the offeror even if the one who performs the requested act does not know of the offer. (Emphasis added).
As explained in the comments to this article, this provision “subjects the offeror of a reward to an obligation which is legal rather than contractual.” La. Civ.Code art. 1944, Revision Comments-1984 (a), citing 1 Litvinoff, Obligations 288 (1969); Taylor v. American Bank and Trust Co., 17 La.App. 458, 135 So. 47 (Orl.1931). The comments also note:
An important segment of modern French doctrine supports the view that the offer of a reward made to the public is binding even when the party who performs the act does not know of the offer. This result is predicated on the binding effect of a unilateral declaration of will. See 6 Planiol et Ripert, Traité pratique de droit civil frangais 164 (2nd ed. Esmein 1952); 2 Demogue, Traité des obligations en général 204, 264, 267 (1923). See also 1 Litvinoff, Obligations 278-279 (1969).
Moreover, under our jurisprudence, a defendant is bound by his offer to the public, which obligates him to pay the reward to the person who performs the requested act. Salbadore v. Crescent Mutual Insurance Co., 22 La. Ann. 338 (1870); Cornelson v. Sun Mutual Insurance Co., 7 La. Ann. 345 (1852). Any ambiguity in the offer is construed against the drafter. Salbadore, 22 La. Ann. at 340.
In accord with their offers of rewards made to the public, the defendants, as offerors, were subject to the legal obligations to pay the rewards to anyone who performed the requested act. See La. Civ. Code art. 1944; 6 Saúl Litvinoff, La. Civ. Law Treatise: Obligations § 155, 288 (1969). In this case, the requested act was the conveyance of information leading to the arrest, DNA match, and the formal | ^filing of charges against a suspect in the South Louisiana Serial Killer case through grand jury indictment or Bill of Information before midnight, August 1, 2003.
Under our civilian law, the Alexanders’ performance of the requested act by conveying information to the task force, which information led to the release of Mrs. Alexander’s composite sketch identified by the public as Derrick Todd Lee and the expedited DNA testing scientifically linking Lee to the crimes, obligated the offer-ors to pay the rewards. See La. Civ.Code art. 1944; see also, Salbadore, 22 La. Ann. at 340. Therefore, I find Mrs. Alexander and her son are entitled by law to the rewards. In my view, the defendants in this case are certainly running afoul of the policy which underscores crime stoppers programs and the reason for their existence.

. As organ for the Court in our affirmation of Derrick Todd Lee's first-degree murder conviction and death sentence, I note it was Mrs. Alexander's information that saved the case under the inevitable discovery doctrine, without which this Court would have had to suppress the unconstitutional seizure of Lee’s buccal swabbings. Lee, 05-2098 at p. 31.